**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br>Whitehall Trust, et al.,[1]<br><br>Debtors. | Chapter 11<br>Case No. 25-15241<br><br>(Joint Administration Requested)<br><br>Hearing: December 30, 2025 at 9:00 a.m. |

**DECLARATION OF ABRAHAM ATIYEH**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, Abraham Atiyeh, hereby declare under penalty of perjury:

1.      I am the Manager and main Member of Whitehall Fiduciary LLC ("Whitehall Fiduciary"), as Trustee of Whitehall Trust u/t/a dated August 1, 2007 ("Whitehall Trust"), a Pennsylvania Trust, and Saucon Management LLC ("Saucon Management"), as Trustee of Saucon Trust u/t/a October 7, 2007 ("Saucon Trust"), a Pennsylvania Trust. I am the primary beneficiary of Whitehall Trust and Saucon Trust (collectively the "Trusts"). I am also the primary beneficiary of Manor Trust, which owns Whitehall Manor, Inc. ("Whitehall") and Saucon Valley Manor, Inc. ("SVM") (collectively the "Manors"). Whitehall Trust, Saucon Trust, Whitehall, and SVM are the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors").  As a family run business, I am involved in and generally familiar with the Debtors' day-to-day operations, organization, financial affairs, and books and records.

2.      On December 26, 2025 (the "Petition Date"), the Debtors filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

---

[1] The Debtors in these Chapter 11 Cases are: (i) Whitehall Trust; (ii) Saucon Trust; (iii) Whitehall Manor, Inc. (5606);  (iv) Saucon Valley Manor, Inc. (2894).

1

#125379645v1

"Bankruptcy Code").

3. To enable the Debtors to minimize the adverse effects of commencing these chapter 11 cases, the Debtors have requested various types of relief in their "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtors to transition into chapter 11 and minimize disruption of their operations, thereby preserving and maximizing the value of their estates for the benefit of all parties in interest. I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

4. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the Debtors' operations, their corporate and debt structure and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the First Day Motions.

**A. BACKGROUND**

2

#125379645v1

## A.        Debtors' Corporate Structure

6.        I am the Manager and main Member of Whitehall Fiduciary, and the primary beneficiary of Whitehall Trust. Whitehall Trust's sole asset is real estate located at 1177 6th Street, Whitehall PA 18052. Whitehall Trust leases this property to Whitehall. Whitehall operates a senior living community on the property.

7.        I am the Manager and main Member of Saucon Management, and the primary beneficiary of Saucon Trust. Saucon Trust's sole asset is real estate located at 1050 Main Stret, Hellertown, PA 18055. Saucon Trust leases this property to SVM. SVM operates a senior living community on the property.

8.        Whitehall, a Pennsylvania S-corporation, and SVM, a Pennsylvania S-corporation, are owned by Manor Trust[2], a Pennsylvania trust. I am the primary beneficiary of Manor Trust and the manager and main Member of Anka Management LLC, trustee for Manor Trust.

9.        Nimita Kapoor-Atiyeh is the President of Whitehall and SVM. Priya Atiyeh is the Vice President of Whitehall and SVM. Nimita is my wife. She serves as one of the licensed personal care home administrators for Saucon. Priya (30 years of age) is my daughter, who serves as one of the licensed personal care home administrators for Whitehall.

### B. Overview and Nature of Debtor's Operations

10.        On May 16, 1996, I was in Philadelphia closing on the purchase of a property at 1177 Sixth

---

[2] Manor Trust also owns Saucon Valley Manor II, Bethlehem Manor Senior Living LLC, and Parkland Manor LLC.

3

#125379645v1

Street ("Sixth Street"), a former parachute factory, that I intended to convert into a warehouse. During the closing of that purchase, my mother, Jamilie, called me to say she was preparing dinner and bringing it to my brother's home to celebrate a birthday. I told her I could not talk because I was in the middle of a settlement. Hours later, I received a call that my mother suffered a massive stroke.

11.     My mother remained hospitalized until September in a deep coma. During that time, I came to a painful realization. While hospitals could stabilize my mother's condition, they could not provide the long-term and personalized care she required. At that time, there was no personal care homes in the Lehigh Valley that offered the level of quality, compassion, and dignity I wanted for my mother.

12.     It was then that I decided to develop the Sixth Street property into a personal care home so that no family would ever have to endure what my family was experiencing. I and my immediate family invested our own personal funds into the project because of how deeply the mission mattered to us.

13.     Whitehall Manor was built in stages, each one shaped by the family's lived experience and commitment to care. The first phases opened in 1998 as an assisted living facility and were created with the same love and attention my mother received in her own home. After her passing on Thanksgiving in 1999, our family chose to continue building, not out of obligation, but out of devotion. The final and largest phase of the project was completed in her memory, to honor her life and to ensure that other families would not have to face the fear, helplessness, and lack of options we once did.

14.     From this deeply personal beginning grew not only Whitehall Manor, but a lifelong commitment to caring for others. That same purpose later guided the creation and operation of Saucon Valley Manor and continues to shape how both communities are run today.

15.     After state regulations changed in 2011, the Manors became dual certified as Personal Care Homes ("PCH") (regulated under 55 PA Code § 2600) and Assisted Living Communities ("ALC") (regulated under 55 PA Code § 2800).

16.     PCHs are not designed for seniors to age in place, which distinguish such facilities from ALC and Skilled Nursing Facilities ("SNF"). PCHs are for those "who do not require the services in or of a licensed long-term care facility, but who do require assistance or supervision with Activities of Daily Living, Instrumental Activities of Daily Living, or both." 55 PA Code § 2600.1.3

17.     In 2022, the Manors became a PCH only and no longer seek certification as an ALC to reduce costs.

18.     The Manors provide 24-hour supervision for adults and help with the tasks of daily living such as bathing, dressing, medication assistance, and meal preparation.  The Manors offer care that exceeds the minimum requirements of Regulation 2600. Consistent with their mission of treating residents as extended family, the Manors employ five LPNs and one RN to attend to residents' medical needs.  They provide transportation even though not required. They hold resident meetings and quality management meetings. The Manors have received no complaints related to the care of

---

[3] Activities of Daily Living and Instrumental Activities of Daily Living are defined under 55 PA Code 2600.4.

their residents.  The Manors were recently inspected and are in compliance with PCH requirements.

19.     Residents are supported through recovery, decline, and loss with compassion and dignity. Care teams work closely with families and outside physicians, therapists, and other providers to ensure each resident receives individualized and attentive care.  This commitment to care has been recognized by the community through the Morning Call Readers' Choice Awards, where SVM and Whitehall have been named Best Assisted Living and Personal Care Home for nine consecutive years from 2017 through 2025.

20.     The Manors employ [280] hourly and [7] salaried workers. Debtors' employees share this same sense of heart and responsibility. They are not just staff, but caregivers who show up around the clock, including days, nights, weekends, and holidays, because care does not stop. Ownership remains hands on and accessible at all times. The facilities are clean, well maintained, and operated by people who genuinely care about the residents who live there.

21.     Historically, the Manors have generated revenues through private pay residents. Presently, Whitehall has [127] residents, which includes [13] memory care individuals. SVM has [197] residents, including [77] memory care individuals. The average resident pays approximately $4500.00 per month at SVM and $4700.00 per month at Whitehall.

22.     The Manors also generate income from a tenant, Good Shepard, that provides on-site physical therapy to residents.

23.     SVM generates revenue from food preparation, maintenance, direct nursing care,

#125379645v1

housekeeping, and activities to Saucon Valley Manor II LLC and food preparation services to Bethlehem Manor Senior Living LLC. Whitehall generates additional revenue from food preparation to Parkland Manor LLC.

24.     The Trusts generate revenue from rent collected from the Manors.

25.     SVM's annual state inspection was on December 3rd and December 4th, 2025. The licensing inspection summary will be submitted on January 1, 2026. Whitehall's annual state inspection was on November 6th and November 10, 2025. The licensing inspection summary was submitted to the state in December, 2025.

26.     The PA Department of Health contracts with the Catholic Diocese of Allentown to send an ombudsman to the Manors for unannounced inspections. The ombudsman speaks directly with the residents, does inspections, and reports any issues. In 2025, the ombudsman visited Saucon approximately 4-5 times and Whitehall 2-3 times.

27.     The COVID-19 pandemic was the greatest challenge ever faced by the Manors.  Beginning in March 2020, every effort was made to protect residents during a time of fear, isolation, and uncertainty. When Personal Protective Equipment ("PPE") was scarce, it was aggressively sourced by the Manors. Strict infection control protocols were enforced, and constant communication with families was maintained through phone calls, newsletters, texts, and emails. When limited visitation became possible, safe and structured methods were created for families to see their loved ones.

28.     The Manor's commitment to their residents extended further when a separate building,

#125379645v1

Bethlehem Manor 3, was acquired so that residents who tested positive for COVID-19 could be safely cared for, without other residents being at risk of exposure. This proactive approach to resident safety was recognized when Lehigh Valley Hospital selected the Manors among the first in the state to receive COVID-19 vaccines in January 2021.

29.     While these efforts saved lives, they came at an overwhelming financial cost. Staffing shortages, increased labor expenses, PPE costs, reduced census, and ongoing operational disruptions severely impacted finances, and resulted in the Trusts being unable to meet their mortgage obligations. Despite these hardships, care for residents never declined and was the primary consideration of the Manors. The Manors' support for staff never wavered. The Manors remained current with their payroll obligations.

**C. Debtors' Debt**

30.     Debtors' main categories of debt include:

    a.     Mortgages against both parcels of real estate

    b.     Property taxes against both parcels of real estate

    c.     Intercompany debt

*Mortgages*

31.     On January 26, 2012, M&T Realty Capital Corporation (M&T) provided a loan of $15,788,700.00 ("Whitehall Mortgage") to Whitehall Fiduciary LLC secured by a Note against real property at 1177 6th Street, Whitehall PA 18052. The monthly payment was $69,844.95. The last direct payment to lender was February 5, 2021. A reserve account of approximately

$813,690.94 was offset by HUD to apply to delinquent March, April and May 2021 payments and property taxes.

32.    On September 21, 2023, Whitehall and Whitehall Trust entered into a Fourth Amendment to Lease and Memorandum of Lease Extension ("Fourth Amendment"). Pursuant to the terms, Whitehall would pay either $150,000 or 25% of net operating revenue, up to $300,000.00 per annum, whichever is greater ("Base Rent"). Whitehall would receive reductions related to any capital expenditures and real estate taxes paid. The Base Rent would be paid on April 30th of the year following calculation of the Base Rent (i.e. 2025 would be paid in 2026). In 2008, the Base Rent would increase to the greater of $240,000 or 25% of net operating revenue up to 500,000.00 per annum.

33.    On December 1, 2012, M&T provided a loan of $19,462,800.00 ("Saucon Mortgage") to Saucon Trust secured by a Note against real property at 1050 Main Street, Unit #1, Hellertown, PA. The monthly payment was $69,578.58. A reserve account of approximately $437,150.12 was offset by HUD to apply to delinquent March, April and May 2021 payments and property taxes.

34.    On September 21, 2023, Saucon and Saucon Trust entered into a Sixth Amendment to Lease and Memorandum of Lease Extension ("Sixth Amendment"). Pursuant to the terms, Saucon would pay either $150,000 or 25% of net operating revenue, up to $300,000.00 per annum, whichever is greater ("Base Rent"). Saucon would receive reductions related to any capital expenditures and real estate taxes paid. The Base Rent would be paid on April 30th of the year following calculation of the Base Rent (i.e. 2025 would be paid in 2026). In 2008, the Base Rent would increase to the greater of $240,000 or 25% of net operating revenue up to 500,000.00 per

#125379645v1

annum.

35.     The Trusts are in default of the mortgages and foreclosure proceedings are pending. Lender alleges that for Whitehall the total debt as of June 2024 is approximately $13,832,350.68, with a current past due amount of over $2.4 million.  Lender alleges that for SVM the total debt as of June 2024 is approximately $17,516,630.05, with a current past due amount of over $2.2 million.

### Property Taxes

36.     The Trusts owe approximately $371,000.00 in property taxes for the Whitehall location and $412,000.00 in property taxes for the SVM location. The Manors, by agreement with the taxing authorities, have been paying the taxes on the Trusts' behalf as an offset of the Manors' unpaid rent to the Trusts pursuant to the Fourth and Sixth Amendments.

### Intercompany/Insider Debt

37.     From 2020 to present, the Manors have been able to continue their operations without a reduction in care because of intercompany transfers from the owners' other companies to the Manors and contributed personal funds.

### D. Events Leading to the Commencement of these Chapter 11 Cases

38.     The Manors ceased paying rent to the Trusts in February 2021 because they needed to provide for their residents and employees first. Accordingly, the Trusts did not have funding to make payments on their mortgage obligations. The last direct payment to service the mortgages was in 2021.

39.     In the interim, the mortgages were assigned from M&T to the Department of Housing and Urban Development ("HUD") in November, 2022. Following the assignment, the Debtors unsuccessfully sought a loan modification with HUD.

40.     On September 21, 2023, Saucon Trust and SVM executed a Sixth Amendment and Whitehall Trust and Whitehall executed a Fourth Amendment (collectively the "Amended Leases").

41.     In 2023, HUD subsequently auctioned the mortgages. Upon information and belief, Windstream Capital LLC purchased the mortgages for a significant discount of approximately 2.8 million (Whitehall) and 3.2 million (Saucon). In June 2024, the mortgages were assigned to Lehigh Valley I LLC ("Lehigh"), the current mortgage holder.

42.     The Debtors believe that the assignments may not have been properly executed or recorded. Additionally, the assignment from HUD to Windstream may not have occurred in accordance with bidder qualification requirements.

43.     On June 20, 2024, Lehigh filed foreclosure actions in the Eastern District of Pennsylvania against Whitehall Fiduciary LLC, as Trustee of Whitehall Trust u/t/a dated August 1, 2007 (Docket No. 24-02627) and Saucon Trust u/t/a dated October 1, 2007 (Docket No. 24-02709).

44.     On August 7, 2024, Lehigh filed a Motion to Appoint Receiver.

45.     On May 2, 2025, the Court entered an order appointing Erin Duffy, Esq. of Duane Morris LLP as Receiver (the "Retention Order") for the benefit of Lehigh. Among other provisions, the

#125379645v1

Retention Order directs the Trusts to turnover confidential resident information of the Manors to the Receiver so that rents can be collected from the residents directly, despite the Manors not being parties to the foreclosure action. Although the receivership and May 2nd Order only pertains to the Trusts, the Receiver and the Court (through subsequent court orders) have sought enforcement against the Manors as well. The Retention Order requires turnover by the Trusts and "all persons acting under their direction," however, the Manors are tenants of the Trusts, non-parties to the mortgages and foreclosure action, do not act under the Trusts' direction, and are subject to Federal and State laws related to Personal Care Homes, including the disclosure of certain resident information. Therefore, the Retention Order did not apply to the Manors.

46. The Trusts filed a Motion to Stay the Appointment of the Receiver and the Receiver filed a Motion for Contempt against the Trusts for violating the Retention Order and a Motion to Compel the Debtors to turnover of records.

47. Following, the Motion to Compel was granted and the Motion to Stay was denied.

48. On December 9, 2025, the Court issued an order that failure to respond to the Receiver's Subpoenas issued to the Manors would result in sanctions. Failure of the Debtors to comply within twenty days (by December 29, 2025) would result in sanctions.

49. On December 18, 2025, an evidentiary hearing was held related to the Receiver's Motion for Sanctions and Lehigh's Motion to Avoid and Set Aside Lease Amendments and for Declaratory Judgments against the Trusts, Abraham Atiyeh, and Nimita Kapoor Atiyeh.

50. On December 19, 2025, the Court issued an order sanctioning the Debtors and voiding the

12

Amended Leases ("December 19th Order").

51.   The December 19th Order directed:

a.   The Manors to turnover funds received from its physical therapy tenant since October 31, 2025 to the Receiver.

b.   The Manors to turnover all receipts from occupants to be paid beginning January 2026; and

c.   Deemed the Amended Leases null and void.

52.   If the Manors are required to turnover all funds received, they will need to immediately cease operations, relocate residents and terminate all employees because they will have no revenue with which to provide services to the residences or pay employees.

53.   Accordingly, the Debtors have made the difficult decision to seek Chapter 11 relief to restructure their operations to best ensure that continued and uninterrupted services are provided to their residents at the same level that my family has ensured since the Manors began operations.

54.   To date, the receivership has collected no estate property; therefore, the Debtors estates will not need to expend resources to recover assets from the Receiver.

### a.  Desired outcomes for Chapter 11 process

55.   Through the Chapter 11 process, the Debtors intend to resolve the mortgage debt owed by the Trusts so that SVM and Whitehall may continue serving residents, employees, and the community in the spirit in which they were created.

#125379645v1

## II. Motions filed with the Chapter 11 Petitions

### A. Motion of the Debtors for an Order Directing Joint Administration of their Related Chapter 11 Cases (the "Joint Consolidation Motion")

56. As set forth herein, the Debtors in the Chapter 11 Cases are related entities. The Debtors request that, in light of the fact that Debtors have each filed a petition in this Court, the Court can and should jointly administer these Chapter 11 Cases.

57. Jointly administering the Chapter 11 Cases: (a) will ease the administrative burden on the Court and the parties; (b) will protect creditors of different estates; and (c) will 11 simplify the United States Trustee's supervision of the administrative aspects of the Chapter 11 Cases.

58. Many of the motions, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor. Entry of an Order directing joint administration of these cases will permit the Debtors to reduce fees and costs in connection with the administration of these cases by avoiding the duplication of efforts associated with, for example, filing multiple duplicative documents in the Debtors' various individual cases, monitoring each of the Debtors' individual dockets and maintaining individual case files for each of the Debtors that will largely duplicate one another. In addition, the ability of parties in interest to monitor these cases will be facilitated by having all pleadings grouped together on one docket. Joint administration also will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files.

59. Quite simply, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

60. As a result, the Debtors seek the entry of an Order directing joint administration of these Chapter 11 Cases for procedural purposes only.

### B. Motion for an Order Establishing Certain Notice, Case Management, and Administrative Procedures (the "Case Management Motion")

61. By the Case Management Motion, the Debtors seek entry of an order establishing certain notice, case management, and administrative procedures (the "Case Management Procedures"), which include the following: (a) prescribing procedures for notice to creditors and parties in interest (b) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)–(6) will be served upon a specified list of parties and those creditors who file with the Court a request that they receive such notices pursuant to Bankruptcy Rule 2002; (c) allowing electronic service of all documents (except complaints and summonses); and (d) directing that all matters be heard at monthly omnibus hearings to be scheduled in advance by the Court. The Debtors further request that the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules apply to these Chapter 11 cases to the extent that they do not conflict with the Case Management Procedures. This will provide for effective and streamlined case management procedures, which are necessary to keep administrative expenses to a minimum.

### C. DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO FILE (i) A CONSOLIDATED MATRIX AND (ii) A CONSOLIDATED LIST OF THEIR TOP TWENTY (20) UNSECURED CREDITORS; (II) AUTHORIZING AND APPROVING SPECIAL NOTICING AND CONFIDENTIALITY PROCEDURES, (III) ESTABLISHING A COMPLEX SERVICE LIST; (IV) GRANTING THE REQUEST FOR AN EXPEDITED HEARING WITH REDUCED NOTICE PERIOD AND LIMITED NOTICE AND (V) GRANTING RELATED RELIEF (the "Consolidation, Special Noticing and Confidentiality Motion")

62. By the Consolidation, Special Noticing and Confidentiality Motion, the Debtors seek entry

of an order, authorizing the Debtors to file a consolidated creditor matrix and a consolidated list of Debtors top twenty (20) unsecured creditors; and authorizing the Debtors to redact certain personally identifiable information, to implement procedures to protect confidential resident and employee information; to establish a Complex Service List; and granting the request for an expedited hearing with reduced notice period.

63.     This motion will provide for effective and streamlined procedures, which are necessary to keep administrative expenses to a minimum. Moreover, Local Rule 8011-2 calls for the redaction of certain personal data identifiers from all documents and pleadings filed with the Court.

D. **Motion for Entry of an Order Authorizing the Debtors to (I) Continue Cash Management System and (II) Waiving Certain United States Trustee Requirements (the "Cash Management Motion")**

64.     By the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to (i) continue to use its existing cash management system, (ii) waiving certain United States Trustee requirements and (iii) granting related relief.  The Debtors also request that the Court authorize the Debtors' banks to continue to maintain, service and administer the Bank Accounts.

65.     The use of the Cash Management System is essential to maintaining the Debtors' operations during this case and, therefore, to maximizing the value of the Debtors' estate.  The Debtors use the Cash Management System to collect receivables from its operations, pay down debts, pay vendors, manage and support its business operations, and pay its payroll company.  The Cash Management System also serves a strategic function, facilitating the Debtor's cash monitoring, forecasting, and reporting.

#125379645v1

66.     The Manors bank accounts are with Truist Bank. The Trusts have no active bank accounts.

   E. **Motion of Debtors for Order Authorizing Use of Cash Collateral (the "Cash Collateral Motion")**

67.     The Debtors have an urgent need for the immediate use of cash collateral following the filing of the Petition.  Indeed, access to the use of pre-petition cash collateral in the form of pre-petition accounts receivable and pre-petition gross receipts is essential to ensure that the Debtors can fund their immediate post-petition operating requirements and other financial obligations. Absent the ability to use cash collateral, the Debtors will not be able to pay wages, insurance, and other critical expenses incident to the Manor's operations.

68.     The Debtors believe that the expenses reflected on the Initial Budget submitted with the Cash Collateral Motion (the "Initial Budget") represent the minimum reasonable and necessary business expenses that must be paid in order for the Manors to remain in operation and continue serving their important community function.  Absent the immediate and continued funding of these essential operating and administrative costs, the Debtors would suffer irreparable harm at the very outset of these cases.

69.     Without approval of the use of cash collateral, the Debtors will not be able to continue operating and will instead be forced to wind down their operations rather than resuscitate them. Uninterrupted access to working capital is critical to maintaining the Manors' employee workforce, infrastructure, status as award winning PCHs, and the preservation of estate assets for the benefit of all creditors and parties in interest.

70.     Accordingly, by the Cash Collateral Motion, the Debtors seek authority to use cash

#125379645v1

collateral consistent with the Initial Budget.

**F. Motion for an Order (A) Authorizing the Debtors to Pay Certain Pre-petition (I) Wages, Salaries, Bonuses, and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; (B) Confirming that the Debtors May Continue Pre-petition Employee Programs in the Ordinary Course of Business; and (C) Directing Banks and Other Financial Institutions to Honor all Related Checks and Electronic Payment Requests (the "Wage Motion")**

71.    To minimize the personal hardship that the Debtors' employees would suffer if pre-petition employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtors' workforce during this critical time, by the Wages Motion, the Debtors seek authority to pay and honor, in its sole discretion, certain pre-petition claims for, among other items: wages, salaries, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, and taxes), health benefits, insurance benefits, workers' compensation benefits, life insurance, PTO, disability coverage, floating holidays and all other benefits that the Debtors have historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

72.    Additionally, in an abundance of caution, the Debtors request the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this chapter 11 case in its sole discretion without the need for further Court approval.

73.    The Debtors will not pay any prepetition wage claims over the priority limit of 11 U.S.C. § 507(a)(4) (currently $17,250).

18

74.     The Manors employ approximately [280] Employees are paid on an hourly basis and the remaining [7] Employees are paid on a salary basis. The average bi-weekly salary is approximately $360,000 bi-weekly. Isolved administers the payments to the employees, taxing authorities, and insurance companies.

G. **Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utility Motion")**

75.     In connection with the operation of its organization, the Debtors obtain electric, water, telephone, internet and other similar utility services provided by a number of utility companies (the "Utility Providers").  The Utility Providers service the Manors.  Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of its reorganization.  Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtors' ability to run the senior living facilities in violation of state law. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, its operation and creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during this Chapter 11 Case.

76.     By the Utility Motion, the Debtors seek the entry of interim and final orders: (a) determining that its Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures; (e)

19

#125379645v1

determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed by this Motion.

77.   Because the Debtors have kept relatively current on the payment of utility bills, a deposit equal to two weeks of average service is adequate.

H.   **Motion of the Debtors for Entry of an Order Authorizing the Debtors to Maintain and Renew Prepetition Insurance Policies and Pay all Obligations in Respect Thereof (the "Insurance Motion")**

78.   In connection with the operation and management of its organization, the Debtors maintain numerous insurance policies, providing coverage for, among other things, General Liability, Professional Liability, Automobile Insurance, and Workman's Compensation (collectively, the "Insurance Policies").

79.   By the Insurance Motion, the Debtors request authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtors determine, in its discretion, that payment is necessary or appropriate.

I.   **Motion for an Order (A) Authorizing but Not Directing the Debtors to Remit and Pay Prepetition Taxes and (B) Authorizing And Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests (the "Taxes Motion")**

80.   In the ordinary course of their business, the Debtors pay real property taxes.

81.   If the Debtors do not pay the taxes, the respective Authorities may take actions that could have a wide-ranging and adverse effect on the Debtors' operation as a whole. Indeed, the Debtors are presently making tax payments through an agreed payment plan with the respective

20

#125379645v1

Authorities. Accordingly, by the Taxes Motion, the Debtors seeks authority, in their sole discretion, to continue to honor their payment plan and to pay Taxes without regard to whether such obligations accrued or arose before or after the Petition Date.

J. **Application of Debtors For An Order Authorizing Employment and Retention of OMNI As Notice and Claims Agent (the "Claims Agent Application")**

82. The Debtors seek authority to retain Omni as claims and noticing agent.

83. Omni is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases. Indeed, Omni has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest. Further, Omni will work with the Clerk's Office to ensure that such methodology conforms with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

84. Omni has substantial experience in matters of this size and complexity and has acted as the official notice, claims and solicitation agent in many large bankruptcy cases in this circuit and other circuits nationwide.

85. Retention of Omni will facilitate the efficient administration of this bankruptcy case and will relieve the Debtors and its counsel from devoting time and attention to noticing and related issues. As a result, the Debtors will incur reduced counsel fees.

#125379645v1

**K. Application of the Debtors Pursuant to Section 327(a) of the Bankruptcy Code for Authority to Employ Dilworth Paxson LLP as Counsel for the Debtors (the "Dilworth Retention Application")**

86.     By the Dilworth Retention Application, the Debtors seek to retain Dilworth Paxson LLP ("Dilworth") as counsel pursuant to section 327(a) of the Bankruptcy Code because Dilworth has extensive experience and knowledge in the field of debtor's and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Additionally, Dilworth possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts in Pennsylvania.

87.     In preparing for its representation of the Debtors in this case, Dilworth has become familiar with the Debtors' business and affairs and many of the potential legal issues that may arise in the context of these Chapter 11 cases.

88.     The Debtors believe that the employment of Dilworth is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors-in-possession, and to implement the restructuring and reorganization of the Debtors.  Accordingly, the Debtors believe that Dilworth is both well-qualified and uniquely able to represent the Debtors in these Chapter 11 cases in an efficient and timely manner.

89.     The Debtors do not seek an expedited hearing with respect to the Dilworth Retention Application or other professional retention applications, with the exception of its application to employ a claims and noticing agent.

22

#125379645v1

Dated:        12/26/2025                                    BY:

                                                           /s/ Abraham Atiyeh
                                                           Abraham Atiyeh
                                                           Manager

#125379645v1