**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WHITEHALL TRUST, | : | Case No. 24-15241 (PMM) |
| *Debtor.* | : | |
| | : | |
| In re: | : | |
| | : | Chapter 11 |
| SAUCON TRUST, | : | |
| *Debtor.* | : | Case No. 24-15243 (PMM) |
| | : | |
| | : | |
| In re: | : | |
| | : | Chapter 11 |
| WHITEHALL MANOR, INC. | : | |
| *Debtor.* | : | Case No. 24-15245 (PMM) |
| | : | |
| | : | |
| In re: | : | |
| | : | Chapter 11 |
| SAUCON VALLEY MANOR, INC. | : | |
| *Debtor.* | : | Case No. 24-15244 (PMM) |
| | : | |
| | : | |

**FIRST OBJECTION OF SECURED CREDITOR LEHIGH
VALLEY 1, LLC TO MOTION FOR (1) INTERIM AND FINAL
ORDERS (A) AUTHORIZING DEBTORS TO USE CASH
COLLATERAL OF EXISTING SECURED PARTY AND
GRANTING ADEQUATE PROTECTION FOR USE AND
(B) PRESCRIBING FORM AND MANNER OF NOTICE AND
SETTING THE TIME FOR THE FINAL HEARING AND
(2) EXPEDITED HEARING ON THE RELIEF SOUGHT HEREIN**

Secured Creditor Lehigh Valley 1, LLC ("Lender") objects to the Motion for (1)
Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing
Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and
Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing
on the Relief Sought Herein (the "Cash Collateral Motion," ECF 17) filed by Whitehall

Trust, Saucon Trust, Whitehall Manor, Inc., and Saucon Valley Manor, Inc. (collectively, the "Debtors"). In support of this objection, Lender states as follows:

**INTRODUCTION**

1.      The Debtor's last-minute, holiday bankruptcy filings are part and parcel of their ongoing effort to evade their clear obligations to the Lender. The Lender holds a first-priority (except to the extent the Debtors have allowed real estate taxes to become delinquent), perfected security interest in all of the Debtors' property, including the real estate owned by Whitehall Trust and Saucon Trust (collectively, the "Trust Debtors") and the rents due to Whitehall Manor, Inc. and Saucon Valley, Inc. (collectively, the "Manor Debtors").

2.      The Debtors' bankruptcy filings follow a long history of efforts to avoid payment of their obligations to the Lender, including:

- Failure to make any payments to their secured creditors for nearly five years;

- Failure to pay real estate taxes for several years, resulting in the accrual of tax liabilities that prime the Lender's perfected, otherwise first-priority security interests;

- Entering in to nakedly fraudulent "lease amendments" that purported to forgive the two years of unpaid rent the Manor Debtors owe to the Trust Debtors, eliminating rent for an additional year, and modifying the amount due to essentially eliminate any future rent obligations;

- Refusing to provide basic insurance documentation as required under the applicable loan documents; and

- Defaulting in their obligations under various orders issued by the District Court in pending foreclosure actions to the extent the District Court imposed various sanctions on the Debtors.

3.     These actions resulted in the Lender's filing of foreclosure actions against the Debtors. As a result of the Debtors' conduct, the District Judge Catherine Henry of this District has entered orders:

- Appointing a Receiver for the Trust Debtors' property;

- Imposing sanctions on the Debtors;

- Ordering the Manor Debtors to deliver their rents to the Receiver; and

- Invalidating the fraudulent lease amendments.

4.     Just one week after the entry the most recent adverse order against the Debtors, and just one day before they were obligated to pay sanctions, deliver documents to the Receiver, and hand over their rents, the Debtors filed for bankruptcy protection.

5.     Given this context, the Debtors filings present obvious issues, including, without limitation, whether they were filed in good faith or with proper authorization, whether they should be treated together or separately, whether the Receiver should be allowed to retain control of the Debtors' property, and whether the Debtors have any chance of successfully reorganizing.

6.     More immediately, the Debtors seek permission from this Court to use the Lender's cash collateral to pay expenses, including payments to or for the benefit of family members and non-debtor insiders and affiliates and unnecessary payments, without providing any meaningful adequate protection for the Lender's interests.

7.     Specifically, the Lender objects to the Cash Collateral Motion for the following reasons:

- The proposed adequate protection is grossly inadequate, as it provides for no payments of debt service. The Debtors' proposed replacement liens are on property the Lender already has a lien on. The Debtors' own Budgets show their continued operation is not protection for the Lender. Instead, the Debtors must pay contractual debt service and keep the

properties insured and current on property taxes to adequately protect the Lenders' security interests in cash collateral.

- The Debtors proposed use of cash collateral must provide for payment of current rent obligations the Manor Debtors owe to the Trust Debtors, consistent with 11 U.S.C. 363(d)(3).

- Any use of cash collateral must require weekly reporting to the Lender concerning actual versus budget receipts and expenses, rent received and due, other revenues received, and detail of expense payments.

- The Debtors' Budgets propose to pay plainly improper expenses. The Debtor proposes to pay Management Fees to an affiliate under the control of the same individual, expenses for the benefit of non-debtor affiliate entities, wages to family members of the same individual, payment of taxes and insurance without regard to whether those are necessary to pay on an interim basis, and an enormous and unjustified reservation for payment of bankruptcy legal fees.

8.      Lender respectfully submits that this Court should not permit allow the Debtors to use cash collateral on an interim basis unless the Court imposes limitations to ensure that the Lender's interests are adequately protected, necessary and appropriate payments are made, and that the use of cash collateral not be a means to permit the Debtors to continue to line their insiders' pockets while evading their obligations to their secured creditor.

9.      Simply put, the Debtors seek to use the automatic stay as a sword, to evade the consequences of their misconduct, and to continue consuming Lender's cash collateral, without providing the requisite (or any) adequate protection. This Court should not countenance this misuse of the bankruptcy process.

<h1 style="text-align:center">FACTUAL BACKGROUND</h1>

## A. THE LOANS AND DEFAULTS

10. On January 26, 2012, M&T Realty Capital Corporation ("M&T") provided a loan to Whitehall Trust in the amount of $15,788,700, secured by a mortgage on the real property located at 1177 6th Street, Whitehall, Pennsylvania.

11. On December 1, 2012, M&T provided a loan to Saucon Trust in the amount of $19,462,800, secured by a mortgage on the real property located at 1050 Main Street, Unit #1, Hellertown, Pennsylvania. Both properties house senior living facilities.

12. The loans were insured by U.S. Department of Housing and Urban Development ("HUD"), and due to Whitehall Trust's and Saucon Trust's payment defaults, both notes and both mortgages were assigned by M&T to HUD effective November 16, 2022. HUD then held a publicly advertised loan sale, at which Windstream Capital LLC was the authorized and winning bidder on these two loans. HUD then assigned both notes, both mortgages, all security agreements, and all related loan documents to Windstream Capital LLC on September 20, 2023. Windstream Capital subsequently assigned the loan documents to Lender on May 15, 2024.

13. Neither Whitehall Trust nor Saucon Trust (collectively, the "Trust Debtors") has made a **single** voluntary mortgage payment on either loan since February 2021—a period of nearly five years. Due to the Trust Debtors' defaults, both Loans were accelerated, and demand was made for the immediate payment of all amounts due. However, the Debtors continued to refuse to make any mortgage payments on either loan.

14. The total amounts due and owing by the Trust Debtors to Lender are as follows as of December 22, 2025:

| Saucon Trust | | Whitehall Trust | |
|---|---|---|---|
| Principal | $16,238,862.47 | Principal | $12,487,669.04 |
| Interest | 1,860,702.99 | Interest | 1,934,548.06 |
| Tax & Insurance | (91,067.24) | Tax & Insurance | (65,842.96) |
| Late Charges | 76,536.35 | Late Charges | 76,829.50 |
| Miscellaneous Fees | 151,099.11 | Miscellaneous Fees | 160,316.37 |
| Payoff Processing Fee | 650.00 | Payoff Processing Fee | 650.00 |
| Recording Fee | 70.75 | Recording Fee | 110.00 |
| TOTAL | $18,236,854.33 | TOTAL | $14,594,280.01 |

### B.    TAX DELINQUENCIES AND RISK OF TAX SALE

15.    As a result of the Debtors' failure to pay real estate taxes, both Properties were subject to significant tax and municipal liens which caused the Properties to be listed for tax sale. The Trust Debtors (through the Manor Debtors) entered into a tax repayment plan, which to date has repaid the past due 2023 property taxes.

16.    However, the Debtors currently still owe approximately $371,000 in property taxes for Whitehall and $412,000 in property taxes for Saucon—a combined total of approximately $783,000 in delinquent real estate taxes.

17.    These tax liens prime Lender's mortgage liens and continue to erode Lender's collateral position.

### C.    APPOINTMENT OF RECEIVER

18.    On June 20, 2024, Lender filed foreclosure actions in the Eastern District of Pennsylvania against both Trust Debtors (Case Nos. 24-cv-02627 and 24-cv-02709). On August 7, 2024, Lender filed Motions to Appoint a Receiver for both Properties.

19.    On May 2, 2025, presiding District Judge Catherine Henry entered an Order appointing Erin Duffy, Esq. of Duane Morris LLP as Receiver for both Properties for the benefit of Lender. (A copy of this Order is attached hereto as Exhibit A.) In the Opinion in Support of the Order, the Court found that: (a) the mortgages themselves provided that

the holder "shall be entitled to the appointment of a Receiver of the rents and profits of the mortgaged premises as a matter of right and without notice"; (b) Defendants had failed to make payments since February 2021—over four years; (c) audited financial statements showed "substantial doubt about the Trust's ability to continue as a going concern"; and (d) appointment was necessary to manage the Properties and ensure bills would be paid on time and structures maintained. (A copy of the opinion is attached hereto as Exhibit B.)

20.     The Receiver's Order authorized and directed the Receiver to collect all rents and directed that "Rents and Leases shall be turned over to Receiver and the Defendant shall be enjoined and restrained from collecting the Rents and Leases of the Properties or interfering with Receiver's ability to collect said Rents and Leases."

**D.     THE FRAUDULENT LEASE AMENDMENTS**

21.     Prior to the loan defaults and prior to the HUD sale to Windstream (now Lender), the Lease Agreements between Debtor Whitehall Manor and Debtor Saucon Valley Manor (collectively, the "Manor Debtors"), on one hand, and the property-owning Trust Debtors, on the other hand, required substantial monthly rent payments as follows:

| Lease | Monthly Rent | Annual Rent |
|---|---|---|
| Whitehall Manor to Whitehall Trust | $139,000 | $1,668,000 |
| Saucon Manor to Saucon Trust | $142,118 | $1,705,421 |
| **COMBINED TOTAL** | **$281,118** | **$3,373,421** |

22.     Effective as of September 21, 2023—*after* the mortgages had defaulted, *after* HUD had taken over the loans, and *after* HUD had auctioned the loans—Abraham Atiyeh (the Manager of the Trust Debtors) unilaterally, on behalf of the Debtor Trusts, and on behalf of the Manor Debtors (allegedly operated by his wife), drafted, prepared and executed two purported lease amendments (the "Fourth Amendment" for the

Whitehall property and the "Sixth Amendment" for the Saucon property). These lease amendments, for which Debtor Trusts received no consideration:

> (a) **Waived ALL rent from March 2021 through September 2023**— approximately 2.5 years of rent totaling approximately **$8.4 million**;
>
> (b) **Waived ALL rent for the year 2024 totaling over $3.3 million;**
>
> (c) Set **maximum rent of only $300,000/year** per property for 2025 (less the amounts paid by the Manor Debtors for taxes and capital improvements); and
>
> (d) Were executed in **violation of Section 2(c) of the Lessee Security Agreements**, which required prior written consent of the Lender for any lease modifications.

23.    Abraham Atiyeh admitted under oath that the Debtor Trusts received no consideration from the Manor Debtors for these lease amendments. These amendments were designed to strip rental income from the property-owning Debtor Trusts (whose cash flow was pledged to the mortgage lender) and to keep all cash in the operating Manor Debtors (controlled by the same Atiyeh family).

### E.    DECEMBER 19, 2025 ORDER VOIDING THE LEASE AMENDMENTS AND IMPOSING SANCTIONS

24.    Lender filed a Motion to Void and Set Aside the Lease Amendments and for Declaratory Judgment in July 2025. The Receiver filed a Motion for Sanctions based on the Respondents' failure to comply with prior Court-ordered document production.

25.    On December 19, 2025—just one week before the bankruptcy filing— District Judge Henry entered an Order in the Foreclosure Action which provided:

> 1.    GRANTED the Receiver's Motion for Sanctions;
>
> 2.    Ordered Respondents to pay $21,281.00 to the Receiver by December 29, 2025;

3. Ordered Respondents to produce all documents required by the Court's September 2, 2025 Order by December 29, 2025;

4. Warned that failure to comply would result in striking Defendants' Answer and Affirmative Defenses and entering Judgment of Foreclosure;

5. GRANTED Lehigh's Motion to Void and Set Aside Lease Amendments;

6. DECLARED the Sixth Amendment and Fourth Amendment to be NULL, VOID, and OF NO LEGAL EFFECT;

7. Ordered the Manors to turn over to the Receiver any rental payments received from Good Shepherd Rehabilitation Hospital since October 31, 2025;

8. Ordered the Manors to turn over to the Receiver ALL receipts from occupants to be paid beginning January 2026.

(A copy of the December 19, 2025 Order is attached hereto as Exhibit C.)

26.     The Debtors' four bankruptcy petitions were all filed on December 26, 2025—just one day before the December 29, 2025 Court's sanctions deadline, and just one week after the entry of the December 19, 2025 Order.

**F.      THE LESSEE SECURITY AGREEMENTS ENTITLE LENDER TO ALL RENTS FROM MANOR DEBTORS**

27.     Lender's collateral package is more extensive than a typical mortgage. Lender holds by assignment:

1. **Mortgages:** Against real property, improvements, equipment, personal property, and "rents, profits and other attributes."

2. **Security Agreements (Debtor Trusts):** Security Agreement, with filed UCC-1s against all personal property, accounts receivable, cash, and rents of Debtor Whitehall Trust and of Debtor Saucon Trust.

3. **Lessee Security Agreements (Manor Debtors):** Critically, Lender also holds signed Lessee Security Agreements with filed UCC-1's

providing Lender with a perfected, first-priority security interest in *all personal property, accounts receivable, and <u>rents</u> of both Debtor Whitehall Manor, Inc. and of Debtor Saucon Valley Manor, Inc.*—the OPERATING entities.

28. The Lessee Security Agreements grant Lender a security interest in "all rents, leases, income, revenues, issues, profits, royalties and other benefits arising or derived... from the Premises" and "all accounts, accounts receivable, general intangibles, chattel paper, instruments, documents, inventory, goods, cash, bank accounts," including "all healthcare insurance receivables, including, but not limited to Medicaid and Medicare receivables, Veterans Administration or other governmental receivables, private patient receivables." (Copies of the Lessee Security Agreements and associated UCC-1 filings are attached hereto as Exhibits D and E.)

29. Accordingly, Lender holds a security interest in and has the right to collect rents directly from all the residents living at the properties. The Manor Debtors themselves granted this security interest to the original lender, and the security interests run with the assigned loans.

### G. THE RENT STREAM: LENDER'S CASH COLLATERAL

30. Based on the Debtors' own filings, the two Properties generate the following revenue:

| Property | Residents | Avg. Rent | Monthly Revenue |
|---|---|---|---|
| Whitehall Manor | 127 | $4,500 | $571,500 |
| Saucon Valley Manor | 197 | $4,700 | $925,900 |
| **TOTAL MONTHLY ANNUAL REVENUE** | **324** | | **$1,497,400 $17,968,800** |

31. The generated rent is Lender's cash collateral. Every dollar collected by Debtor Whitehall Manor and by Debtor Saucon Valley Manor from the residents residing at the two properties is subject to Lender's security interests.

32.     However, the Debtors improperly propose to spend all of the collected rent – Lender's cash collateral – on operations, while paying Lender nothing.

**H.     CONTRACTUAL DEBT SERVICE AND REAL ESTATE TAXES**

33.     Based on the December 19, 2025 District Court Order, and the Lessee Security Agreements, all rent and revenue collected from occupants of the Properties are due to the Receiver, or now to Lender as the secured party. As the Debtors' fraudulent lease amendments have been voided by Judge Henry of the EDPA, the original lease terms apply, requiring monthly rental payments of $139,000 (from Debtor Whitehall Manor) and $142,118 (from Debtor Saucon Manor).

34.     The amounts due from the Debtor Trusts pursuant the contractual terms of the promissory notes and the mortgages are as follows:

| Item | Monthly Amount | Basis |
|------|---------------|-------|
| Whitehall Mortgage P&I | $69,844.95 | Contract |
| Saucon Mortgage P&I | $69,578.58 | Contract |
| Whitehall Tax Escrow (~$120K/yr) | $10,000.00 | 1/12th |
| Saucon Tax Escrow (~$110K/yr) | $9,167.00 | 1/12th |
| Insurance Escrow (~$851K/yr) | $70,917.00 | 1/12th |
| **MINIMUM MONTHLY ADEQUATE PROTECTION** | **$229,507.53** | |

35.     The Debtors' Budget, however, proposes to make no payments to Lender while consuming approximately $1.5 million per month in revenue that constitutes Lender's cash collateral.

36.     Further, Debtors' Budget contains no payments to keep ongoing property taxes current.

**I.     INSURANCE CONCERNS AND FORCE-PLACEMENT REQUIREMENTS**

37.     For over six months, Lender has repeatedly requested complete copies of the insurance policies covering the Properties. Despite these repeated requests, the

Debtors have provided only heavily redacted copies of insurance documentation. Based on the limited information provided, *it is impossible for Lender to determine whether the Properties carry adequate insurance coverage.*

38. This is not a mere technicality. These facilities house over 320 vulnerable elderly residents—127 at Whitehall Manor and 197 at Saucon Valley Manor. These seniors, many of whom have mobility issues and require assistance with daily activities, are exposed to numerous potential hazards, including slip-and-fall accidents, medication errors, and other incidents common to personal care homes. Any single catastrophic incident could result in massive liability exposure.

39. The grave dangers facing senior care facilities were tragically illustrated just three days before the bankruptcy filing. On December 23, 2025, a catastrophic gas explosion at the Silver Lake Nursing Home in Bristol Township, Bucks County, Pennsylvania—approximately 20 miles from Philadelphia—killed two people and injured twenty others. The explosion was so powerful that it caused part of the first floor to collapse into the basement, trapping immobile residents inside. Governor Shapiro described the explosion as catastrophic. First responders were forced to brave flames, collapsing walls, a heavy gas odor, and even a second explosion to rescue trapped residents—many of whom could not walk and were in wheelchairs.

40. The Bristol tragedy underscores the critical importance of ensuring adequate insurance coverage for facilities housing vulnerable populations.

41. Without unredacted copies of the insurance policies, Lender cannot verify that the Properties are adequately protected against property damage, general liability, professional liability, or catastrophic loss.

42.     Under Section 6 of the Lessee Security Agreements, the Lessees covenanted to "purchase and maintain insurance at all times with respect to the Premises" and to "furnish the Secured Party with certificates or other evidence satisfactory to the Secured Party of compliance with the foregoing insurance provisions."

43.     Under Section 6.01(B) of the Lease Agreements, in the event the Lessee fails to maintain required insurance, "the Owner may, at its option and upon such notice to the Lessee as is reasonable under the circumstances, procure and maintain such insurance. The Lessee agrees and covenants to pay any amounts so advanced therefor by the Owner, together with interest thereon at the prime rate of interest published in the Wall Street Journal plus five percent (5.0%), from the date thereof."

44.     If the Debtors cannot immediately provide complete, unredacted copies of all insurance policies demonstrating adequate coverage to this Court, Lender will be forced to exercise its contractual right to force-place insurance on both Properties. The cost of such force-placed insurance—which is typically significantly more expensive than standard coverage—must be included as part of the requisite adequate protection payments. Lender should not be required to bear the risk of inadequate, or undisclosed, coverage while the Debtors improperly consume Lender's cash collateral.

**OBJECTIONS TO THE CASH COLLATERAL MOTION**

## I. THE PROPOSED ORDER DOES NOT PROVIDE ADEQUATE PROTECTION TO THE LENDER

### A. Adequate Protection of Lender's Interest is Required

45.     Under 11 U.S.C. § 363(c)(2), a debtor-in-possession may use cash collateral only with the consent of the secured creditor or court authorization after notice and a hearing. Section 363(e) mandates that the court "shall prohibit or condition such use... as is necessary to provide adequate protection" of the secured creditor's interest. 11 U.S.C. § 363(e).

46.     Section 361 provides three non-exclusive examples of adequate protection: periodic cash payments to the extent use results in a decrease in the value of the creditor's interest, replacement liens to the extent use results in a decrease in value, or other relief resulting in the "indubitable equivalent" of the creditor's interest. 11 U.S.C. § 361.

47.     Critically, the burden of proof on adequate protection lies with the party opposing relief from stay—namely, the Debtor. *See* 11 U.S.C. § 363(p); *Resolution Trust Corp. v. Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

48.     The Third Circuit Court of Appeals has established that adequate protection must provide the secured creditor with "the value for which [it] bargained pre-bankruptcy" and "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *Swedeland*, 16 F.3d at 562-63 (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987), and *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985)). The whole purpose of adequate protection for a creditor is to

ensure that the creditor receives the value for which it bargained before the bankruptcy filing occurred.

49.    As noted above, the Lender holds a perfected, first-priority (after the real estate taxes the Debtors have not paid) in all of the Debtors' property, including the Trust Debtors' real estate and the Manor Debtors' rents.

50.    The Debtors propose to provide adequate protection through replacement liens and their ongoing operations. These measures are not adequate to protect the Lenders' interests without payment of the contractual debt service due under the Loan Documents, including, principal, interest, real estate taxes, and insurance.

51.    The Debtors must make debt-service payments in order to adequately protect the Lenders' interests.

**B.    Replacement Liens are insufficient to protect the Lender's interests**

52.    The proposed replacement liens are fundamentally inadequate because the Lender already holds security interests in all of the Debtors' property, including mortgages on both Trusts' real properties, UCC security interests on all personal property of both Trust Debtors, and lessee security agreements on all personal property and rents of both operating Manor entities.

53.    A "replacement lien" on property the creditor already has a lien on provides no additional protection. Courts within this Circuit have explained that such liens are "illusory" and place the creditor in a worse situation" than before the bankruptcy. *See, e.g., In re LTAP US, LLLP,* No. 10-14125(KG), 2011 WL 671761, at *32 (Bankr. D. Del. Feb.

18, 2011)*; see also Hari Ram, Inc. v. Magnolia Portfolio, LLC (In re Hari Ram, Inc.)*, 507 B.R. 114 (Bankr. M.D. Pa. 2014).

54.     The only property the Trust Debtors own is real estate, on which the Lender already holds mortgages.

55.     Similarly, in *Hari Ram,* the court held that "the offer of a replacement lien on post-petition rents is meaningless because [the] creditor already has a lien on these assets under § 552(b)(2)." *Hari Ram*, 507 B.R. 114. Pursuant to Section 552(b)(2), because the Lender already has a a lien on all of the Manor Debtors' personal property, including their agreements with their tenants, and all rental payments the Manor Debtors receives are proceeds of those agreements, the Lender already has a security interest in the $1.5 million per month in post-petition resident rents from each of the Manor entities.

56.     The Trust Debtors' sole assets are real property already subject to the Lender's mortgages, and the Manor Debtors' assets are already subject to Lender's UCC security interests. There is simply nothing of value upon which to grant a meaningful replacement lien.

57.     Additionally, the Debtors' proposed Cash Collateral Order provides only that the Lender will receive Replacement Liens "consistent with the Whitehall and Saucon Mortgages." As discussed above, the Debtors' security interests extend beyond simply these mortgages. The Lender requests that this provision be modified to extend the Replacement Liens to all property "consistent with the Whitehall Trust and Saucon Mortgages, the Whitehall Trust and Saucon Trust Security Agreements and filed UCC-1 Financing Statements, and the Whitehall Manor and Saucon Valley Manor Lessee Security Agreements and filed UCC-1 Financing Statements."

**C.** **The Debtors' continued existence is insufficient to protect the Lender's interests**

58.     The Debtors next argue that preservation of going concern value constitutes adequate protection. This argument fails under controlling Third Circuit authority.

59.     In *Swedeland*, the Court held that "continued construction based on projections and improvements to the property does not alone constitute adequate protection.... Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." 16 F.3d at 566 (citations omitted).

60.     Similarly, in *Pursuit Athletic,* which the Debtor cites, the court found adequate protection by going concern value only where there was "no actual diminution [of] value." *In re Pursuit Athletic Footwear,* 193 B.R. 713, 716-18 (Bankr. D. Del. 1996).

61.     Here, by contrast, the Debtors have not shown that they can preserve their going concern value without actual diminution.

62.     *First*, the Debtors' Budgets show that, on a cash basis, they can operate only at a break-even level for three months, assuming no unforeseen costs. This also ignores their proposed allowance of a 10% variance from the budget, which, if used, would send them far into a negative cash balance.

63.     *Second*, this ignores that while the Debtors are operating on, at best, a cash-neutral basis, they are using up their other assets, such as future rents and accounts receivable. The "income" – presumably in fact cash receipts – reflected in the Budgets are proceeds of other assets, likely rents and other accounts receivable, in which the Lender

already holds a perfected security interest. The Debtors are consuming these assets and are doing nothing to protect the Lender's interest in them.

64. Moreover, Debtors have not asserted, let alone demonstrated, that their operations will generate new property which will replenish these amounts, on which they offer the Lenders a replacement lien. Indeed, the properties are close to fully occupied – Saucon Valley Manor is 94% occupied, and Whitehall Manor is 75% occupied – and the Debtors have little additional capacity to generate additional revenues even if it were feasible to increase occupancy to 100%.

65. *Third*, the Budget itself contains a significant error that shows that the Debtors are unable to operate as a going concern on a cash basis. The first Budget included in the Cash Collateral Motion – presumably for Saucon Valley Manor, though this is not clear because both budgets are titled "Creekside Associates" – shows total "Disbursements" of $2,740,348.36 when calculating net cash flow, but shows "Total Expenses" of $2,842,523,89. If the "Total Expenses" amount is used in the net cash flow calculation, then the Debtors are losing nearly $100,000 over three months.

66. *Fourth,* the Debtors have provided only two proposed budgets, although there are four Debtors. The Debtors have either: (1) improperly consolidated each of the Trust Debtors with the relevant Manor Debtor, without offering any basis for substantive consolidation; or (2) have offered no budget for the Trust Debtors. If the former, the Debtors have jumped the gun and should not be allowed to use cash collateral without identifying which Debtor is responsible for which expenses and which is gong to pay each expense. If the latter, the Debtor is implicitly recognizing the readily apparent fact that the Trust Debtors cannot adequately protect the Lender's interest in their property, lack equity in that property, and have no ability to reorganize. If so, the Lender requests that

the Trust Debtors forthrightly admit those facts and promptly consent to dismissal of their cases, relief from the automatic stay, or another appropriate remedy.

67.     *Fifth*, the Debtors' own Budgets show they have no ability to make mortgage payments. An operation that consumes $1.5 million per month in revenue while paying nothing on account of more than $31 million of secured debt is not "operating profitably" for the secured creditor's or anyone else's benefit (other than insiders); it is systematically diminishing the Lender's collateral position. The cash is being consumed on operations, not preserved for the secured creditor. Property taxes are accruing at approximately $230,000 per year, with $738,000 of past due real estate taxes owed, and these tax liens prime Lender's mortgage liens. Interest continues accruing without payment. Every month that passes, Lender's position deteriorates further.

68.     The Budgets make it readily apparent that the Debtors' ongoing operations provide no protection, let alone adequate protection, of the Lender's interests.

### D.     The Debtors Must Provide Adequate Protection Through Payments of Debt Service

69.     When collateral is deteriorating, relevant authority requires periodic cash payments. In *Ukrainian Savings and Loan Ass'n v. Trident Corp.*, the court affirmed an order granting stay relief where the debtor failed to make mortgage, tax, and insurance payments, holding: "Standing alone, the lack of periodic mortgage payments and the failure of Trident to make arrangements for such payments supports a finding of inadequate protection.... [T]he Bankruptcy Judge did not err in concluding that Trident's slim equity cushion in the property, which was constantly eroding due to Trident's failure

to pay interest, taxes, and insurance premiums, did not provide adequate protection to the Bank." 22 B.R. 491, 495-96 (E.D. Pa. 1982).

70.     Likewise, in *Metropolitan Life Ins. v. Monroe Park (In re Monroe Park)*, the court explained: "[a]ccruing property taxes, or water or sewer charges on the mortgaged property," if unpaid, "erode the value of [the secured creditor's] interest" because these claims are "superior to [the] mortgage lien" and that the court must require compensation for the secured creditor's loss of use of money during the stay, especially when interest charges are accruing and no cash payments offered. 17 B.R. 394, 939-40 (D. Del. 1982).

71.     Based on the foregoing authorities, the Lender respectfully submits that the Debtors should be required, at a minimum, to make adequate assurance payments to the Lender in the amount due under the Loan Documents of $139,423.53 in principal and interest (including $69,844.95 for Whitehall Trust and  $69,578.58 for Saucon Trust),

72.     In addition, unless the Debtors can demonstrate immediately that they are paying currently their real estate taxes and insurance, they should be required to pay monthly, as additional adequate assurance, real estate tax escrow payments of $19,167 (one-twelfth of annual property taxes), and insurance escrow payments of $70,917 (one-twelfth of approximately $851,000 annual insurance).

73.     As the Debtors' proposed replacement liens and going-concern value do not protect the Lenders' interests in the Debtors' property, the Debtors should only be allowed to use the Lenders' cash collateral if they make these adequate assurance payments.

## II. DEBTORS SHOULD BE REQUIRED TO PAY RENT DUE AS PROVIDED IN 11 U.S.C. § 365(D)(3)

74.     As noted above, the District Court has voided the 2023 Lease Amendments. As a result, the prior leases are in place.

75.     Under the effective lease between Whitehall Trust and Whitehall Manor, Whitehall Manor owes a current lease payment of $708,000 due on December 31, 2025. (A copy of the relevant Lease and Amendments is attached hereto as Exhibit F.)

76.     Section 365(d)(3) of the Bankruptcy Code provides, "The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3).

77.     Section 365(d)(3) requires Whitehall Manor to make the $708,000 rent payment to Whitehall Trust due on December 31, 2025, but the Budget makes no provision for that payment.

78.     The 2023 Trust Amendments that the Debtors discuss in their pleadings are no answer. The District Court has already declared them invalid.

79.     The Lender objects to Cash Collateral Motion to the extent it seeks approval of the Debtor's use of cash collateral without requiring the Debtors to fulfill their obligations under the effective leases and under Section 365(d)(3) of the Bankruptcy Code.

## III. ANY CASH COLLATERAL ORDER SHOULD REQUIRE TIMELY REPORTING TO THE LENDER

80. In the proposed Cash Collateral Order, the Debtor proposes to provide the Lender "any reports of operations required to be provided by the prepetition agreements at the same time and in the same manner as set forth therein."

81. At the same time, the Debtors are seeking leave to use the Lender's cash collateral and pay expenses on a weekly basis without any meaningful monitoring. Given the history described above, the Debtors should not be permitted such leeway.

82. The Lender requests that the Debtors be required to provide the following on a weekly basis, to be provided no later than the third business day after the end of each week:

- A report showing the actual amount versus budgeted amount received or expended for each line item in the Budget for the week and the cumulative amounts for each line item since the Petition Date;

- A report of all rents due to the Manor Debtors paid and/or due for the week;

- A report of all other revenues received by any of the Debtors for the week; and

- A detailed report of each expense paid by any of the Debtors during the week.

83. The Lender respectfully requests that, to the extent the Court enters an order allowing the Debtors to use cash collateral on an interim basis, it require the Debtors to provide the foregoing weekly reports.

## IV. THE DEBTOR'S PROPOSED CASH COLLATERAL BUDGET IS IMPROPER

84.     In addition to the lack of adequate protection of the Lender's interests, the Lender objects to the Debtors' Cash Collateral Motion and proposed Budget because they Debtor seeks the Court's blessing to make improper or unjustified payments.

85.     *First,* the Budget includes $214,830.90 in payments for "Management Fees" to an insider or affiliate of the Debtors. The Lender has sough information about the basis, purpose, recipient, and amount of these proposed payments.[1] Without any justification, these payments are at best highly questionable and should not be permitted in an interim cash collateral order. To the extent the Court approves the Debtors' use of cash collateral on an interim basis, it should prohibit payment of any management fees to any affiliate or insider of the Debtors, including Mr. Atiyeh's family members.

86.     *Second,* the Lender understands that one of the Debtors – Saucon Valley Manor – provides various services to affiliated non-debtor entities, including food production, shared employees, and other services. The Debtors' budget appears to include amounts for these categories without any indication whether these amounts include services provided to non-debtor affiliates. To the extent the Court approves the Debtors' use of cash collateral on an interim basis, it should prohibit payment of any expenses for the benefit or use of any non-debtor affiliate or insider of the Debtors.

---

[1]     The undersigned counsel received information purportedly in response to this request, and the other requests below, after 5:00 p.m. on January 29, 2025, the eve of the hearing. Counsel has not had a chance to review this information and reserves all rights regarding it.

87. *Third*, the Lender understands that the Debtors employ close relatives of Abraham Atiyeh, the control person of at least the Debtor Trusts, including his wife and daughter. The Lender has sought information from the Debtors concerning the work they purportedly perform for the Debtors. Any such payment to insiders of the Debtors without any explanation or support is plainly inappropriate. To the extent the Court approves the Debtors' use of cash collateral on an interim basis, it should prohibit payment of any salary or wages to any insider of the Debtors, including Mr. Atiyeh's family members.

88. *Fourth,* the Budget includes payment of taxes and insurance without any explanation of what taxes and insurance are being paid, what period is covered, and which entities are beneficiaries of these payments and whether any are non-Debtors. The Lender has sought this information. Any payment of taxes or insurance that are for taxes that do not constitute a lien on the Debtors' property, insurance that is not required under the loan documents or that covers a non-debtor, or are not for the current period, are not justified. To the extent the Court approves the Debtors' use of cash collateral on an interim basis, it should prohibit any such payments.

89. *Fifth,* the Budget includes a total of $450,000 for payment of legal fees for the Debtors' bankruptcy counsel and Committee counsel, yet the Court has not approved the retention of bankruptcy counsel for the Debtors and no committee has been appointed. To the extent the Court approves the Debtors' use of cash collateral on an interim basis, it should prohibit payment of any salary or wages to any insider of the Debtors.

## RESERVATION OF RIGHTS

90. Notwithstanding the foregoing, Lender reserves all of its present and future rights, claims, and remedies with respect to its liens and security interests in the Debtors' cash collateral, including, without limitation, (i) its right to challenge the validity, extent, perfection, and priority of any liens or interests asserted by the Debtor or any other party in interest in such cash collateral; (ii) its right to contest the Debtors' proposed use of cash collateral and to seek appropriate adequate protection, including additional or replacement liens, additional adequate protection payments, or superpriority claims; (iii) its right to require valuations and to object to any valuation methodologies; (iv) its right to seek modification, expansion, or termination of the use of cash collateral if protections are inadequate; (v) its right to seek relief from the automatic stay or to seek other relief as permitted by the Bankruptcy Code; and (vi) any other rights and remedies available under applicable law, equity, or contract.

WHEREFORE, Plaintiffs respectfully request that this Court enter an appropriate order denying the use of cash collateral except to the extent provided herein.

Respectfully Submitted,

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Dated: December 29, 2025

By: */s/ Matthew A. Hamermesh*
      Matthew A. Hamermesh
      mhamermesh@hangley.com
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200

and

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergeLawPC.com

*Attorneys for Secured Creditor Lehigh Valley 1, LLC*