# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| WHITEHALL TRUST, | : | Case No. 25-15241 (PMM) |
| *Debtor*. | : | (Jointly Administered) |

**OBJECTION OF SECURED CREDITOR LEHIGH VALLEY 1, LLC TO APPLICATION PURSUANT TO 11 U.S.C. § 327(A) OF THE BANKRUPTCY CODE FOR AUTHORITY TO EMPLOY DILWORTH PAXSON LLP AS BANKRUPTCY COUNSEL NUNC PRO TUNC TO THE PETITION DATE**

Secured Creditor Lehigh Valley 1, LLC ("Lender") hereby objects to the Application Pursuant to 11 U.S.C. § 327(a) of the Bankruptcy Code for Authority to Employ Dilworth Paxson LLP ("Dilworth") as Bankruptcy Counsel Nunc Pro Tunc to the Petition Date (the "Application," ECF 30) filed by Whitehall Trust, Saucon Trust (with Whitehall Trust, the "Trust Debtors"), Whitehall Manor, Inc., and Saucon Valley Manor, Inc. (with Whitehall Manor, Inc., the "Manor Debtors"; collectively, with the Trust Debtors, the "Debtors"). In support of this objection, Lender states as follows:

## INTRODUCTION

1. The Debtors have starkly conflicting interests in these bankruptcy cases. The Manor Debtors lease property, on which they operate their business, from the Trust Debtors. The Manor Debtors purportedly benefit from highly advantageous lease amendments executed in 2023, which essentially wiped out any rent payment obligation to the Trust Debtors. The District Court entered an order invalidating the 2023 amendments, but the Lender anticipates the Debtors – or at least the Manor Debtors – will challenge the enforceability of that order in these cases.

2. No one law firm can represent all of these Debtors, given these and other conflicts. Any lawyer would face intense, actual conflicts about which no one lawyer could properly advise all of the Debtors at the same time.

3. Under Section 327(a) of the Bankruptcy Code, a law firm facing such actual conflicts cannot be approved as bankruptcy counsel for debtors in possession. This Court should deny the Debtors application to employ Dilworth as counsel for the Debtors jointly.

## FACTUAL BACKGROUND

4. The Lender incorporates by reference the detailed Factual Background set forth in its First Objection of Secured Creditor Lehigh Valley 1, LLC to Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (ECF 41). The Lender repeats here for emphasis particular portions of the background that are relevant to this objection.

5. The Trust Debtors own real properties located in Lehigh County, Pennsylvania.

6. The Manor Debtors lease the real properties from the respective Debtors and operate personal care homes on them.

7. A copy of the lease between Whitehall Trust and Whitehall Manor, as amended, in effect prior to 2023, is attached hereto as Exhibit A.

8. A copy of the lease between Saucon Trust and Saucon Valley Manor, as amended, in effect prior to 2023, is attached hereto as Exhibit B.

9. The Lender holds a security interest in all of the Debtors' assets. The Lender holds mortgages on the Trust Debtors' real property. In addition, the Lender holds a security interest in and has the right to collect rents directly from all the residents living at the properties.

**A.     Tax Delinquencies and Risk of Tax Sale**

10. As a result of the Debtors' failure to pay real estate taxes, both Properties were subject to significant tax and municipal liens which caused the Properties to be listed for tax sale. The Trust Debtors (through the Manor Debtors) entered into a tax repayment plan, which to date has repaid the past-due 2023 property taxes.

11. Taxes for 2024 and 2025 remain unpaid and outstanding. The Trust Debtors currently still owe approximately $371,000 in property taxes for Whitehall and $412,000 in property taxes for Saucon—a combined total of approximately $783,000 in delinquent real estate taxes.

**B.     The Fraudulent Lease Amendments**

12. Prior to the Lender's acquisition of the loans, the Lease Agreements between Debtor Whitehall Manor and Debtor Saucon Valley Manor (collectively, the "Manor Debtors"), on one hand, and the property-owning Trust Debtors, on the other hand, required substantial monthly rent payments as follows:

| Lease | Monthly Rent | Annual Rent |
|---|---|---|
| Whitehall Manor to Whitehall Trust | $139,000 | $1,668,000 |
| Saucon Manor to Saucon Trust | $142,118 | $1,705,421 |
| **COMBINED TOTAL** | **$281,118** | **$3,373,421** |

*See* Exs. A, B.

13. Effective as of September 21, 2023—*after* the mortgages had defaulted, *after* HUD had taken over the loans, and *after* HUD had auctioned the loans—Abraham

3

Atiyeh (the Manager of the Trust Debtors) unilaterally, on behalf of both the Trust Debtors and on the Manor Debtors (allegedly operated by his wife), drafted, prepared and executed two purported lease amendments (the "Fourth Amendment" for the Whitehall property and the "Sixth Amendment" for the Saucon property; collectively the "2023 Lease Amendments"). These lease amendments, for which Debtor Trusts received no consideration:

    (a) **Waived ALL rent from March 2021 through September 2023**—approximately 2.5 years of rent totaling approximately **$8.4 million**;

    (b) **Waived ALL rent for the year 2024 totaling over $3.3 million;**

    (c) Set **maximum rent of only $300,000/year** per property for 2025 (<u>less</u> the amounts paid by the Manor Debtors for taxes and capital improvements); and

    (d) Were executed in **violation of Section 2(c) of the Lessee Security Agreements**, which required prior written consent of the Lender for any lease modifications.

Copies of the 2023 Lease Amendments for the Whitehall and Saucon properties are attached hereto as Exhibits C and D, respectively.

14. Abraham Atiyeh admitted under oath that the Debtor Trusts received no consideration from the Manor Debtors for the 2023 Lease Amendments. These amendments were designed to strip rental income from the property-owning Trust Debtor (whose cash flow was pledged to the mortgage lender) and to keep all cash in the operating Manor Debtors (controlled by the same Atiyeh family).

**C. Foreclosure Actions and Order Invalidating Fraudulent 2023 Lease Amendments**

15. On June 20, 2024, Lender filed foreclosure actions in the Eastern District of Pennsylvania against both Trust Debtors (Case Nos. 24-cv-02627 and 24-cv-02709, the "Foreclosure Actions").

16. On December 19, 2025—just one week before the bankruptcy filing—District Judge Henry entered an Order in the Foreclosure Actions which provided:

1. GRANTED the Receiver's Motion for Sanctions;

2. Ordered Respondents to pay $21,281.00 to the Receiver by December 29, 2025;

3. Ordered Respondents to produce all documents required by the Court's September 2, 2025 Order by December 29, 2025;

4. Warned that failure to comply would result in striking Defendants' Answer and Affirmative Defenses and entering Judgment of Foreclosure;

5. GRANTED Lehigh's Motion to Void and Set Aside Lease Amendments;

6. DECLARED the Sixth Amendment and Fourth Amendment to be NULL, VOID, and OF NO LEGAL EFFECT;

7. Ordered the Manors to turn over to the Receiver any rental payments received from Good Shepherd Rehabilitation Hospital since October 31, 2025;

8. Ordered the Manors to turn over to the Receiver ALL receipts from occupants to be paid beginning January 2026.

A copy of the December 19, 2025 Order is attached hereto as Exhibit E.

17. The Debtors' each filed bankruptcy petitions on December 26, 2025 — one week after the entry of the December 19 Order.

**OBJECTIONS TO APPLICATION TO EMPLOY
DILWORTH PAXSON LLP**

18. The readily apparent conflicts of interest between the Debtors preclude Dilworth from representing all of them.

5

## I. The Legal Standard for Employment of Bankruptcy Counsel

19. A debtor, "with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons...." 11 U.S.C. § 327(a); *see also Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158 (2015).

20. Employment under section 327(a) is limited to professionals that do not "hold or represent an interest adverse to the estate and are disinterested." *In re Congoleum Corp.*, 426 F.3d 675, 688-89 (3d Cir. 2005) (citing 11 U.S.C. § 327(a)); *see also In re Boy Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022).

21. The Debtors and Dilworth, as the applicant and proposed counsel, bear the burden to establish that Dilworth is "both disinterested and [does] not represent an interest adverse to the estate." *In re Big Mac Marine, Inc.*, 326 B.R. 150, 154 (8th BAP Cir. 2005) (citing *Interwest Bus. Equip., Inc. v. United States Trustee (In re Interwest Bus. Equip., Inc.)*, 23 F.3d 311, 318 (10th Cir. 1994); *In re Huntco Inc.*, 288 B.R. 229, 232 (Bankr. E.D.Mo. 2002)).

22. "Attorneys with actual conflicts face *per se* disqualification...." *Boy Scouts*, 35 F.4th at 158; see *also In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir. 1998) (Section 327(a) imposes "a per se disqualification...of any attorney who has an actual conflict of interest."). "Pragmatically, a conflict is actual when the specific facts before the bankruptcy court suggest that 'it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest.'" *Boy Scouts*, 35 F.4th at 158 (quoting *In re Pillowtex, Inc.*, 304 F.3d 246, 251-52 (3d Cir. 2002)).

23. Additionally, though "disqualification is at the court's discretion for attorneys with potential conflicts," *id.*, potential conflicts of interest may be "sufficiently

egregious to warrant disqualification." *In re Stone Res., Inc.,* No. BR 11-11124-MDC, 2017 WL 1753099, at *11 (Bankr. E.D. Pa. May 4, 2017) (citing *In re BH&P, Inc.,* 949 F.2d 1300 (3d Cir. 1991)). "A court may approve employment of a professional with a potential conflict 'where the possibility that the potential conflict will become actual is remote.'" *In re Vascular Access Centers, L.P.,* 613 B.R. 613, 624 (Bankr. E.D. Pa. 2020) (quoting *In re BH & P, Inc.*, 949 F.2d 1300, 1316-17 (3d Cir. 1991)).

## II. Dilworth Faces an Actual Conflict that Precludes Joint Representation of All of the Debtors

24. The Debtors have actual conflicts of interest that bar any single firm from representing them as bankruptcy counsel pursuant to Section 327 of the Bankruptcy Code.

25. The Trusts are single asset real estate entities. The only way they will be able to operate in bankruptcy and reorganize is if they receive payment of rent under their non-amended leases with the Manors. Thus, they require the payments due on the non-amended leases so that they can pay mortgage (and tax) payments.

26. On the other hand, the Manors lease the properties from the Trusts to operate their businesses. But they need the rent – paid to the Trusts – to be as low as possible so they can attempt to operate profitably. The fraudulent 2023 Lease Amendments achieved that goal – and greatly benefited the Manors to the disadvantage of the Trusts – by virtually eliminating any rent obligation.

27. The divergent interests of the Trusts and the Manors in the terms of the leases and the rent payment obligations is a clear conflict of interest that calls into question the ability of one firm – Dilworth – to represent all of the Debtors in their bankruptcy cases.

7

28.     But this is not merely a potential conflict. This is an actual conflict that is likely to place Dilworth in a position requiring it to favor the interests of some of the Debtors over the conflicting interests of the other Debtors, for several reasons.

29.     *First*, the validity of the 2023 Lease Amendments is an essential question for these bankruptcy cases. But the interests of the Trust Debtors and the Manor Debtors in that question is inevitably in conflict. If the 2023 Lease Amendments are valid, then the Manor Debtors have essentially no rent payment obligation to the Trust Debtors (who will not be able to make any mortgage payments or reorganize). If the 2023 Lease Amendments are not valid, the Trust Debtors are entitled to the lease payments that are necessary to fund their bankruptcies and reorganizations (but the Manor Debtors then would not be able to a fund a reorganization). While Mr. Atiyeh's declaration touts the 2023 Lease Amendments as a key part of the bankruptcy cases, Declaration of Abraham Atiyeh in Support of First Day Motions (ECF 25), at ¶¶ 32, 34, 40, the Application does not mention them at all, let alone explain how Dilworth can advise all of the Debtors about them.

30.     *Second,* the Debtors have starkly divergent interests in how the District Court's December 19 Order is treated in these bankruptcy cases. The Trusts have an interest in enforcing that order, as that will enable them to collect rental payments. The Manors, by contrast, would benefit if the Order were overturned and the 2023 Lease Amendments enforced, as that would enable them to avoid lease payment obligations.

31.     *Third*, the prospect that the 2023 Lease Amendments could be avoided as fraudulent transfers would likewise have opposite impacts on the Debtors' interests. A transfer "is generally considered to be a fraudulent transfer if the debtor was (a) insolvent at the time of the transfer and (b) the debtor failed to receive 'reasonably equivalent value'

in return.'" *In re Wettach*, 811 F.3d 99, 104 (3d Cir. 2016) (cleaned up); *see also Mortimer v. McCool,* 255 A.3d 261, 268 (Pa. 2021) ("A party violates PUFTA when 'the creditor's … claim arose before the transfer, the debtor … made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor became insolvent as a result of the transfer.'" *(quoting Cunningham v. Cunningham,* 182 A.3d 464, 472 n.3 (Pa. Super. 2018))). Mr. Atiyeh has admitted the Trusts received no consideration for the 2023 Lease Amendments and the Debtors were insolvent at the time. They also likely were created "with actual intent to hinder, delay, or defraud" the Lender. 11 U.S.C. § 548(a)(1); *see also* 12 Pa. C.S. § 5104(a)(1) ("A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor…."). The Debtors have obviously conflicting interests in whether the 2023 Lease Amendments should be avoided as fraudulent transfers.

32. *Fourth*, the Debtors face a conflict concerning how Section 365(d)(3) of the Bankruptcy Code applies to the Manor Debtors lease obligations. Section 365(d)(3) provides:

> The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected….

11 U.S.C. § 365(d)(3). The Code allows the Court to postpone a debtor's obligation to comply with lease obligations. *Id.* ("The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day

period."). But any counsel representing both the Trust Debtors and the Manor Debtors faces an obvious conflict in advising them about what Section 365(d)(3) requires in these cases: Must the Manor Debtors pay the amounts due under the leases in effect prior to the 2023 Lease Amendments or not, and should the Trust Debtors seek to enforce those obligations? Should the Manor Debtors seek an extension of their time to perform those obligations, and should the Trust Debtors oppose such an extension? No lawyer could advise both the Trust Debtors and the Manor Debtors about these questions.

33. *Fifth*, the Debtors' interests regarding the property taxes owed and accruing on the real estate the Trust Debtors own are in conflict. The Manor Debtors apparently have agreed to pay the real estate taxes on behalf of the Trust Debtors. But the Debtors have not explained how doing so benefits the Manor Debtors and their creditors and estates. If the taxes are not paid, the Trust Debtors would lose their property. But the Manor Debtors would still have whatever rights they have under their leases.

34. *Sixth*, the fact that the Trust Debtors and Manor Debtors are joint obligors on their loan obligations to the Lender also presents an actual conflict of interest. As this Court has recognized before, representation of a creditor that is also a co-obligor of a debtor is an actual conflict precluding joint representation under Section 327. *In re Harris Agency, LLC*, 451 B.R. 378, 392-93 (Bankr. E.D. Pa. 2011), *affirmed* 462 B.R. 514, 523 (E.D. Pa. 2011); *see also In re Straughn*, 428 B.R. 618 (Bankr. Pa. W.D. 2010).

35. Moreover, the fact that the Trusts have a common principal – Mr. Atiyeh – whose interest in what the Debtors do is aligned, notwithstanding the foregoing conflicts, does not mitigate any conflicts Dilworth faces. Rather, it is evidence of the need for separate counsel. As the District Court held in *Harris Agency:*

> [T]he identical ownership of Harris and Union One is best understood as one more piece of evidence that an actual conflict of interest did in fact exist. Although the interests of the principals of Union One and Harris certainly may have been aligned, i.e. in their desire to sacrifice Harris to ensure the survival of Union One, once Harris became a debtor in possession it no longer had the same interests as its Principals. This is because a debtor in possession owes "the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985). "[A]mong the fiduciary obligations of a debtor-in-possession is the duty to protect and conserve property in its possession for the benefit of creditors." *Marvel*, 140 F.3d at 474 (internal quotation marks omitted). While it may have been in the best interest of the Principals to obtain Harris's clients and to have Harris assume sole responsibility for the loan, this agenda was not in the best interest of Harris, as the debtor in possession, because its goal was to maximize the value of its estate.

*Harris Agency*, 462 B.R. at 523-24.

36. That is precisely the problem here. The interests of Mr. Atiyeh – apparently the principal of all the Debtors – are obviously aligned. But – as debtors in possession – the Debtors do not have the same interests as their principal. They owe "the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession." *Weintraub,* 471 U.S. at 355. No law firm – including Dilworth – could properly advise Mr. Atiyeh as principal of the Debtors about how they should fulfill their conflicting obligations as debtors in possession.

### III. Even if Dilworth Faces Only a Potential Conflict, It Precludes Joint Representation of All of the Debtors

37. Even if these conflicts were only potential, they are still sufficiently likely to ripen into actual conflicts that this Court should deny the Application.

38. As noted above, potential conflicts of interest may be "sufficiently egregious to warrant disqualification." *Stone Res.,* 2017 WL 1753099, at *11 ( citing *BH&P, Inc.,* 949 F.2d 1300). "A court may approve employment of a professional with a potential conflict

'where the possibility that the potential conflict will become actual is remote.'" *In re Vascular Access Centers, L.P.,* 613 B.R. 613, 624 (Bankr. E.D. Pa. 2020) (quoting *In re BH & P, Inc.*, 949 F.2d 1300, 1316-17 (3d Cir. 1991)).

39. The likelihood that a potential conflict in these cases will become actual is anything but remote.

40. The leases – and particularly the 2023 Lease Amendments – are essential to the operations and value of both the Trust Debtors and the Manor Debtors. A determination of the questions concerning the leases and the 2023 Lease Amendments outlined above is essential to these cases. Without resolving them, it will be impossible for the Debtors to confirm a plan of reorganization or otherwise resolve their bankruptcy cases.

41. Even if any conflicts were merely potential, they preclude approval of the Debtors' application to employ Dilworth.

## RESERVATION OF RIGHTS

42. Notwithstanding the foregoing, Lender reserves all of its present and future rights, claims, and remedies with respect to its liens and security interests in the Debtors' property, including, without limitation, (i) its right to challenge the validity, extent, perfection, and priority of any liens or interests asserted by the Debtor or any other party in interest in such property; (ii) its right to contest the Debtors' proposed use of cash collateral and to seek appropriate adequate protection, including additional or replacement liens, additional adequate protection payments, or superpriority claims; (iii) its right to require valuations and to object to any valuation methodologies; (iv) its right to seek modification, expansion, or termination of the use of cash collateral if protections are inadequate; (v) its right to seek relief from the automatic stay or to seek

other relief as permitted by the Bankruptcy Code; and (vi) any other rights and remedies available under applicable law, equity, or contract.

WHEREFORE, the Lender respectfully requests that this Court enter an appropriate order denying the Application to employ Dilworth Paxson LLP as bankruptcy counsel for the Debtors.

Respectfully Submitted,

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Dated: January 7, 2026

By: */s/ Matthew A. Hamermesh*
Matthew A. Hamermesh
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com

and

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergeLawPC.com

*Attorneys for Secured Creditor Lehigh Valley 1, LLC*