**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br>Whitehall Trust, et al.,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br>Case No. 25-25-15241 (PMM)<br><br>(Jointly Administration) |

**DEBTORS' RESPONSE TO (A) SECOND OBJECTION OF SECURED CREDITOR LEHIGH VALLEY 1, LLC TO MOTION FOR (1) INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL OF EXISTING SECURED PARTY AND GRANTING ADEQUATE PROTECTION FOR USE AND (B) PRESCRIBING FORM AND MANNER OF NOTICE AND SETTING THE TIME FOR THE FINAL HEARING AND (2) EXPEDITED HEARING ON THE RELIEF SOUGHT HEREIN AND (B) SUPPLEMENTAL OBJECTION TO DEBTORS' CASH COLLATERAL MOTION AND LENDER'S CROSS-MOTION FOR SANCTIONS**

The above-captioned Debtors and Debtors-in-Possession (together, "Debtors"), by and through undersigned counsel, hereby submit this response (the "Response") to (A) the second objection (the "Objection") of Lehigh Valley 1, LLC (the Lender") to the Debtors' motion to use cash collateral (the "Motion") and (B) Supplemental Objection to Debtors' Cash Collateral Motion and Lender's Cross-Motion for Sanctions (the "Supplement"), as follows:

**A. THE OBJECTION SHOULD BE OVERRULED**

1. The Objection, which is supported only by generic legal authority that is not tied to the facts and circumstances of these cases, simply attaches multiple documents from the prepetition foreclosure action (significant portions of which the Lender fails to mention are presently pending appeal), and is the Lender's most recent attempt to derail, distract from and prevent the Debtors' progress in these cases so that it can acquire the Debtors' properties and businesses for itself at the expense of the Debtors and all other interested parties.

---

[1] The Debtors in these Chapter 11 Cases are: (i) Whitehall Trust; (ii) Saucon Trust; (iii) Whitehall Manor, Inc. (5606); (iv) Saucon Valley Manor, Inc. (2894).

#125424518v1

2.    Indeed, the Response is rote with contradictions.  For example, in paragraphs 6-8, while acknowledging the Debtors' successful prepetition efforts toward resolving their property tax obligations, the Lender notes that the remaining tax liens prime the Lender's mortgage liens, stating with no explanation that those liens continue to erode the Lender's collateral position - despite no additional tax liens being imposed since the Petition Date.  In paragraph 27, the Lender falsely claims that the Debtors' Budget contains no payments to keep ongoing property taxes current, yet later, in paragraph 44, the Lender takes issue with the fact that the Debtors propose in their Budget to make payments for taxes, insurance and maintenance – payments that protect the Lender's collateral value and position as of the Petition Date.  In fact, the Debtors are escrowing funds to ensure that they will be able to pay post-petition property taxes as they come due post-petition and have already engaged in discussions with certain taxing authorities toward treatment of tax claims in a Chapter 11 plan.

3.    The Lender's legal argument on pages 10 and 11 of the Response is not tied to the facts and circumstances of these cases. The Lender asserts at page 10 the basic premise that Debtors may not use consolidated cash collateral budgets where doing so will harm creditors. While this may be a true statement of the law based on the case cited, Lender identifies no harm being suffered by itself or any other creditor in these cases.  Likewise, the Lender baldly sets forth general statements of law regarding *sub rosa* plans, but makes no effort to explain how its references relate to the relief sought or Budget proposed by the Debtors in these cases.  Indeed, the Debtors' cases have been pending for less than one month and, from the outset, the Debtors have confirmed their intent to resolve all of their debts, including those owed to the Lender, intercompany debt and other debt, in a Chapter 11 plan that may include substantially consolidating their operations. Again, these cases have been pending less than 30 days, during

2

which the Debtors have spent the vast majority of every day, including weekends and holidays, responding to voluminous and burdensome discovery requests requiring responses within only a few days and subjecting themselves and certain contractors to depositions propounded by the Lender. Accordingly, the Debtors have not yet had time to fully negotiate and propose a Chapter 11 plan.

4. Finally, the Lender's simple statement of the law regarding the remedy of substantive consolidation and accounting for all cash collateral under section 363 is not explained. To be sure, the Debtors are accounting for all cash collateral in their possession, custody and control in their Budget. The Trust Debtors do not have income or revenue other than their intercompany receivables from the Manor Debtors. All revenues are accounted for in the Manor Debtors' Budgets.

5. Since the initial hearing in these cases, Debtors have been working to ensure all data regarding their operations is accurately reported and accounted for, including addressing concerns of the Lender and United States Trustee that the Debtor pay insiders only for actual work necessary to maintain and operate the Debtors' businesses.

6. Ironically, while the Lender takes issue with paying insider employees for work actually performed for the Debtors and paying the insider management company even for out of pocket expenses and shared services provided to the Debtors, the Lender insists that the Debtors make insider, intercompany, post-petition rental payments to each other that would only result in the collapse of the Debtors' businesses to the detriment of all interested parties and give the Lender a clear path to taking over the Debtors' operations. It is no surprise that if the Manor Debtors were required to pay post-petition rent to the Trust Debtors at this time, they would have no income to continue operations, residents would need to be relocated (and would not be able to

3

recover state mandated refunds) and the Lender would take control of all assets for itself, to the exclusion of all other creditors.

7. The Lender points to Mr. Atiyeh's deposition testimony in a vacuum that the Manors could continue to operate if someone else owned the Trust properties. Follow up questions were not asked by the Lender, such as: Could the Manors continue to operate if someone else owned the Trust properties and the Manors were required to pay that owner the rent required under the current leases? The Manor Debtors can only continue to operate by resolving all of the Debtors' obligations in Chapter 11, including its intercompany debt, taxes and resolving issues with the Lender.

8. Regarding the rent, as with all intercompany debts, the rental payments, if not paid, will accrue on an administrative basis and be dealt with in the Debtors' Chapter 11 plan. There is absolutely no depreciation in the Lender's security interests while the Debtors use the rents to continue as a going concern pending resolution of their debts in an orderly fashion under a Chapter 11 plan. The Lender has provided no evidence of any impairment of its interests in the Debtors whatsoever.

9. To be sure, the Lender asserts a security interest in all assets of all of the Debtors. The Lender is the largest creditor of all of the Debtors, having acquired the mortgages on the Trust Debtors' properties at a steep discount.

10. Whether the Manor Debtors or Trust Debtors hold the rent revenue, the value of assets in which the Lender asserts an interest remains the same. Indeed, the use of that rent revenue by the Manor Debtors in accordance with the Budget puts all of the Debtors in the best position to maximize the value of the Debtors' assets and operations for the benefit of the Lender and all other interested parties.

11. Moreover, discontinuing the Debtors' use of cash collateral would immediately depreciate the Lender's collateral and preclude all creditors except for the Lender from recovering on their claims.

12. As indicated at the first day hearing, the Debtors are not opposed to providing periodic reports of their use of cash collateral consistent with the Budget in the same manner provided by the prepetition agreements. The Lenders have instead requested detailed weekly reports that would require the Debtors to expend significant cost and would be cumbersome at best, requiring the use of accountants, particularly given that payments be check during one week may not clear until the following week. The Debtors have no objection to providing a check register or summary of payments and expenses on a rolling basis from their quick books, so that the Lender can assure itself that the Debtors' revenues are being expended in accordance with their Budget, but submit that paying an accountant to provide a formal weekly analysis of weekly income and expenditures does not benefit the estates and serves no purpose but to increase the cost of these cases.

### B.  THE DEBTORS HAVE COMMITTED NO SANCTIONABLE CONDUCT

13. As an initial matter, Lender's purported "cross-motion" for sanctions relating to information regarding Priya Kapoor-Atiyeh ("Priya"), the cross-motion was filed under the guise of a supplemental objection to the Debtors' use of cash collateral on January 23, 2026. The Debtors have not had sufficient time to review data and deposition transcripts or prepare a fulsome response; therefore, the Debtors object to the cross-motion being considered at the hearing on January 27, 2026.

14. To the extent that the Court elects to nevertheless consider the cross-motion no sanctions should be awarded because no sanctionable conduct has occurred.

15. In the Supplement, the Lender misconstrues testimony and data from the Debtors to create an appearance that the Debtors misrepresented information about Priya Kapoor-Atiyeh's employment, going so far as seeking sanctions based on the Lender's mistaken assumptions.

16. Based on the attachments to the Supplement, no misrepresentation was made by the Debtors at the first day hearing or otherwise.

17. Nothing in the transcript of the first day hearing was untrue at the time. The statements made about Priya at that hearing were based on information obtained from the Debtors in advance of the expedited hearing - that she was co-administrator of Whitehall Manor, that she was included in Whitehall Manor's payroll (making $95,000 per year) and that she worked at least 20 hours per week (a requirement of a licensed administrator).

18. Also during that hearing, the Debtors explained their efforts to reduce expenses since the COVID pandemic by reducing administrative staff and providing shared services between the Debtor Manors as well as other manors under affiliated ownership through a management company also under affiliated ownership. In that regard, discussion occurred about the Debtors being able to account for intercompany reimbursements owed to and from the Debtor Manors and their affiliates for personnel and shared services, which the Debtors agreed to disclose in their cash collateral budgets and ensure that the various manors reimbursed each other such that the Debtor Manors were not paying for personnel and services provided to other manors.

19. At no time during the first day hearing or otherwise did the Debtors state that Priya worked exclusively for the Debtor Manors, nor that the minimum of 20 hours required to be worked as an administrator were all spent at the Debtor Manors. In fact, as part of the Debtors' cost reductions, both Priya and Nimita Kapoor-Atiyeh perform services for both Manor Debtors as well as other affiliated manors, as do the few nurses and certain other employees.

10733238_1
#125424518v1

20. Subsequent to the first day hearing, the Debtors provided significant discovery and data to the Lender on an extremely expedited basis at the Lender's request, including additional data relating to Priya's compensation as of the Petition Date. This information confirmed that Priya was included in the Whitehall Manor payroll, that her weekly hours were shared among the Debtor Manors and others and that she worked at least 20 hours per week.

21. Subsequent to providing the additional data, the Lender sought to depose Priya. The Debtors repeatedly suggested that the Lender hold off on her deposition or obtain a verification from her regarding her services.

22. The Lender insisted on deposing Priya.

23. At her deposition, Priya confirmed that she served as co-administrator of Whitehall Manor and does the payroll for all of the affiliated manors. She testified about her involvement and estimated weekly hours with Whitehall Manor and the other manors, but confirmed that the majority of her time was spent at Parkland Manor.

24. Post-petition, and as Priya testified during her deposition, because she spent most of her time at Parkland Manor, she was moved from the Whitehall Manor payroll to the Parkland Manor payroll (Whitehall Manor and Saucon Valley Manor now reimburse Parkland Manor for the hours that she works at those facilities).

25. The Lender now seeks sanctions against the Debtors because they deposed Priya – a deposition the Debtors urged them not to pursue due to the level of significance of Priya's involvement with the Manor Debtors' operations – and learned that Priya's involvement in the Debtors' operations was insignificant and that she was not the VP of Whitehall.

26. No misrepresentations were made by the Debtors at the first day hearing or otherwise. To the extent that the Lender wasted its time (and that of the Debtors) taking Priya's deposition,

such waste was the result of Lender's haste and assumptions and its choice not to take heed when the Debtors repeatedly informed the Lender regarding the extent of her involvement in their operations.

27. As part of the discussions during the first day hearing and thereafter with the Lender and the Office of the United States Trustee, the Debtors have been working to account for each and every shared service and personnel to ensure that all amounts paid by the Debtors on behalf of other entities and all amounts paid by other entities on the Debtors' behalf are accurately accounted for and reflected in the Budget - ensuring that the Debtors pay only for personnel and services utilized by the Debtors. The Debtors have adhered to this practice from the outset of these cases, including by moving personnel to the payroll system of the manor at which each primarily provides services.

28. As the Debtors have made no misrepresentation regarding the services provided by or compensation paid to Priya, the cross-motion and claims in the Supplement must be denied.

## Conclusion

Aside from including citations to basic bankruptcy law, without tying them to the facts and circumstances of this case, Lender has set forth no basis for denying Debtors' use of cash collateral and no basis for requiring adequate protection beyond the replacement liens it has been provided. The Debtors' ongoing operations, combined with a Budget that accounts for every penny of reimbursement among the related Debtor and non-debtor manors pending submission of the Chapter 11 plan, best ensure that the Debtors will be able to maximize the value of their estates for the benefit of all interested parties, including the Lender. All of the Debtors' income and expenditures are included in the proposed Budgets, including intercompany reimbursements for all shared personnel and services. The Lender's objections to the Debtors' continued use of

10733238_1
#125424518v1

cash collateral must be denied. Further, to the extent that this Court considers Lender's request for imposition of sanctions regarding Priya, that request must be denied. For these reasons and those stated above, the Objection should be overruled, including Lender's request for sanctions.

Dated: January _26_, 2026                         DILWORTH PAXSON LLP

/s/ Anne M. Aaronson
Lawrence G. McMichael
Anne M. Aaronson
Michelle V. Lee
DILWORTH PAXSON LLP
1650 Market Street, Suite 1200
Philadelphia, PA 19103
(215) 575-7000

*Proposed Counsel for the Debtors and Debtors-In-Possession*

#125424518v1