IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | **)** | Chapter 11 |
|  | **)** |  |
| Whitehall Trust, et. al., | **)** | Case No. 25-15241 (PMM) |
|  | **)** |  |
| *Debtors.* | **)** | Jointly Administered |
|  | **)** |  |

## **MEMORANDUM OPINION**

I.      INTRODUCTION

Before the Court is Secured Creditor Lehigh Valley 1, LLC's ("Lehigh") Motion to Dismiss Trust Debtors' Bankruptcy Cases Because They Are Ineligible to Be Debtors Under Section 109 of the Bankruptcy Code ("the Motion") [doc. #102].  Debtors responded to the Motion [doc. #190], Lehigh replied [doc. #202], and Debtors sur-replied [doc. #220].  An evidentiary hearing was held on February 24, 2026 ("the Hearing") at which Debtors' principal testified, the parties submitted oral arguments, and exhibits were admitted into evidence.  Thereafter, the Court took the matter under advisement.  Upon review of the relevant facts and law, the Motion will be granted.

II.     FINDINGS OF FACT

There are four (4) putative debtors in this jointly administered Chapter 11 case.  Debtors Whitehall Manor and Saucon Valley Manor (together, "the Manors") operate Personal Care Homes for the elderly.  Meanwhile, Debtors Whitehall Trust ("Whitehall") and Saucon Trust ("Saucon") (together, "the Trusts")[1] each lease to their namesake Manors the real estate on which they operate. These properties comprise the Trusts' sole assets.  Whitehall was formed on August 1, 2007, for a

---

[1]      The Manors and Trusts will be referred to collectively as "the Debtors."

term of fifty years. Dx-13 at 1; id. ¶ 3.6. Saucon was formed on October 1, 2007. Abraham Atiyeh ("Atiyeh") settled the Trusts. Although both trusts were formed under the laws of Pennsylvania, Atiyeh does not recall the Trusts filing documents with the Pennsylvania Department of State. February 24, 2026, Hr'g Tr. [Doc. #256] ("Hr'g Tr.") at 60. Whitehall Fiduciary LLC has always been Whitehall's trustee. Atiyeh served as Saucon's trustee until 2012, when Saucon Management LLC succeeded to that role. Both corporate trustees are owned and managed by Atiyeh, id. at 15, who testified that the Trusts were formed to profitably operate and lease real estate, collect rent, service their mortgages, and ensure associated taxes were paid. Id. at 16. Atiyeh also testified that the Trusts were formed at the behest of their principal creditors, M&T Realty Capital Corporation ("M&T") and the United States Department of Housing and Urban Development ("HUD"). Id. at 16, 18. Atiyeh assumed M&T and HUD viewed the Trusts as vehicles for preserving the Manor properties and shielding their owners from lawsuits arising out of Manor operations. Id. at 45–49.

On October 1, 2007, Atiyeh conveyed to Saucon the Saucon Manor property. The deed prominently states that it constitutes a "TRANSFER FROM AN INDIVIDUAL TO A LIVING TRUST AND IS EXEMPT FROM REALTY TRANSFER TAX." Dx-3 at 3. Saucon initially entered into a mortgage with National Penn Bank. As mortgagor, Saucon's trustee was co-liable with Saucon Valley Manor on a $15,000,000.00 note secured by the Manor property. Atiyeh testified that this loan served to satisfy an existing mortgage and finance construction of additional Saucon Manor units. On August 5, 2009, Saucon secured another construction loan from National Penn Bank, whose $3,824,310.00 note was also secured by the Manor property. For its part, on August 14, 2008, Whitehall Fiduciary entered into a mortgage with M&T. The associated $15,788,700.00 note was secured by the Whitehall Manor property. And on August 18, 2008, Atiyeh conveyed to Whitehall the Whitehall Manor property. The deed states that it constitutes a

conveyance: "from a person to a Trust created by him in which the only beneficiaries are the Grantor and his spouse and lineal descendants, and this transaction is therefore exempt from Pennsylvania real estate tax." Dx-14 at 3. This was the final conveyance into the Trusts.

Pennsylvania authorities were unmoved by the deed's disclaimer. Accordingly, on October 20, 2009, the Pennsylvania Board of Finance and Revenue ("the Tax Board") issued an Order upholding two (2) prior administrative rulings that Whitehall owed $279,683.00 in back taxes pursuant to the 2008 transfer of the Whitehall Manor property. Dx-16; Ex. A at 1, 4. Atiyeh argued "that the subject transfer was a transfer to a living or ordinary trust." Id. at 2. But the Tax Board reached the opposite conclusion. Undeterred, on November 20, 2009, Atiyeh took yet another appeal, this time to the Commonwealth Court of Pennsylvania. See Dx-17. However, no decision was rendered in this instance because a stipulated judgment was entered on March 24, 2011, whereby Whitehall agreed to pay back taxes in the reduced amount of $90,000.00. Id.; Dx-18. Atiyeh intended to argue on appeal that Whitehall was a living trust. Hr'g Tr. at 41. Atiyeh still believes the Tax Board's characterization of the transfer was unfounded because he "owned both sides of the . . . settlement sheet." Id. at 49. Atiyeh does not recall paying transfer tax on the Saucon property transfer. Id. at 41.

The Trusts' mortgages were later refinanced. First, on January 19, 2012, Whitehall refinanced its loan with M&T. Then, on December 1, 2012, Saucon entered into a $19,462,800.00 mortgage with M&T, secured by the Saucon Valley Manor property. Atiyeh testified that to qualify for these mortgages, the Trusts had to maintain cash reserves for building repairs and demonstrate prior compliance with a debt service coverage ratio. Id. at 31–32. He also testified that, prior to the onset of Covid-19, the Trusts paid back $24,000,000.00 in principal and interest. Id. at 35.

3

The original trust instruments are quite similar.  Both contain "Spendthrift Clause[s]."  Dx-4 ¶ 7; Dx-13 ¶ 9.  Each instrument now contemplates the same intra-family succession plan.  If Atiyeh predeceases his wife, she will succeed him as the primary beneficiary and recipient of net Trust income.  Dx-4 ¶ 2.2.1; Dx-13 ¶ 3.2.1.  Assuming Atiyeh and his wife predecease their children and/or lineal descendants, the latter become the primary beneficiaries, and the trust corpuses must eventually be distributed to them.  Dx-4 ¶¶ 2.2.4–2.2.4.4; Dx-13 ¶¶ 3.2.4–3.2.4.5.  The instruments provide the trustees with a broad slate of powers.  For example, both trustees were authorized to take out the loans recounted above.  Dx-4 ¶ 3.12; Dx-13 ¶ 4.1.  The trustees can also: rent, lease, or sell Trust property; "repair . . . build, construct, remodel, renovate and complete" the same; pay Trust expenses; hire professionals; lend money; apportion expenses between principal and income; distribute Trust assets; splinter the Trusts; make certain tax elections; and allocate capital gains.  See generally Dx-4 ¶¶ 3.1–3.22; Dx-13 ¶¶ 4.1–4.24.  Although the trustees can exercise these powers without beneficiaries' consent, they must act "at all times in a fiduciary capacity primarily in the interest of the beneficiaries[.]"  Dx-4 ¶ 3.18; Dx-13 ¶ 4.18.

In 2012, Saucon's trust instrument was amended to further reflect Whitehall's in that Saucon then became subject to certain HUD Provisions as well.  These Provisions were effective only while the Trusts' mortgages were insured by HUD; so, the Provisions are no longer in force.  But before they lapsed, they proscribed, *inter alia*, dissolution of the Trusts or amendment of their terms without HUD's approval, and assignment of interests in the Trusts to those not bound by the "HUD Regulatory Agreement."  The latter references HUD's Regulatory Agreement for Multifamily Housing Projects, which both Trusts eventually signed, and which has since lapsed.  The version of the Agreement Whitehall signed in 2008 required HUD's approval before, the Trust could, *inter alia*: convey or incumber its interests in the Manor Project; remodel or otherwise alter

Manor property; distribute Project income; or engage "in any other business or activity[.]" See Dx-21. This Agreement also required Whitehall to maintain a reserve fund, "suitably equip [and maintain] the project for assisted living facility operations," and keep books and records of Project operations, including an annual financial audit, and make such documents available for HUD's inspection. The Agreement proscribed unapproved bankruptcy filings.

On August 14, 2008, Whitehall entered into a Lease Agreement with its Manor affiliate. LVx-1. Article IV contains a "Net Lease" provision, obligating the Manor to pay "all costs and expenses related to the use and occupancy of the Leased Premises[.]" Id. ¶ 4.05. This includes the payment of "Operating Expenses," id., which are defined elsewhere as all those "required in operating and maintaining the Leased Premises," like the cost of: "utilities, maintenance, repair, alteration, insurance . . . inspection . . . professional[s] . . . [and] all taxes," except for those levied on Whitehall's income. Id. ¶ 1.01. Similarly, Article V obligates the Manor to: pay "all costs of operating the Leased Premises"; "keep and maintain . . . the Leased Premises and all additions and improvements thereto"; "make all repairs, renewals, replacements[,] and improvements to the Leased Premises;" and "furnish [Whitehall] with copies of any inspection reports made by [HUD], and promptly undertake to correct any deficiencies[.]" Id. ¶ 5.01. The Agreement broadly defines "Leased Premises" to encompass the Manor parcel and any real or personal property "now existing or at any time acquired, constructed[,] or located thereon[.]" Id. ¶ 1.01.

Saucon's Lease Agreement with its affiliated Manor contains similar provisions. See e.g., LVx-2 ¶ 5 ("Net Lease" provision); id. ¶ 8 ("Landlord shall have no obligation to inspect or maintain the Premises, or to make repairs or replacements to the Premises of any kind or nature, including those to the roof, foundation, or exterior walls[.]"). Both Agreements were most recently amended on September 21, 2023. See LVx-3; LVx-4. Pursuant to these amendments, the Trusts:

5

acknowledged prior repairs and other such work on the Premises performed by the Manors; waived all delinquent rental obligations; waived forthcoming rental obligations through the end of 2024; required the Manors to continue making repairs to the Premises as needed; required the Manors to pay utilities and insurance premiums for the Premises; and required future rental payments, which could be offset entirely by the Manors' "capital expenditures . . . payment for any real property obligation . . . uncollected accounts receivable or bad debt."

On direct examination, Atiyeh testified that the Trusts contracted with HUD-approved accountants who maintained corporate records and conducted annual audits.  Hr'g Tr. at 32–33.  Prior to 2021, when the Trusts were last profitable, HUD used these audits to gauge its approval of adjustable income distributions to Atiyeh through the Trusts, which represented his "profit from managing the real estate venture."  Id. at 36.  Atiyeh also testified that Saucon hired a contractor to build rooms in connection with the 2009 expansion of Saucon Manor.  Id. at 33–34.  In fact, Atiyeh testified that both Trusts engaged contractors to make repairs identified as necessary by HUD's building inspectors.  Id. 34–35.

On cross-examination, Atiyeh conceded that the Trusts were only engaged in the business of leasing their properties to the Manors.  Id. at 59.  The Trusts have no other means of generating income.  Id. at 58.  Atiyeh agreed that Saucon's lease is of the triple-net variety, id. at 56, which typically means that "the tenant pays all expenses."  Id. at 53.  Atiyeh suggested that Whitehall was responsible for maintenance of and improvements to the exterior of its associated Manor facility.  Id. at 55–56.  But Atiyeh also testified that his construction company, Pennsylvania Venture Capital ("PVC"), performs all Manor repairs.  Id. at 63.  PVC manages the Trusts' real estate.  Id. at 57.  PVC also collects and deposits rent for the Trusts and reconciles their checking accounts.  Id. at 58.  Atiyeh could not recall if the Trusts were audited again after 2021.  Id. at 44.

6

No one disputes that "[t]he Manors ceased paying rent to the Trusts in February 2021[,]" or that "[t]he last direct payment to service the [Trusts'] mortgages was in 2021." 1st Day Decl. of Abraham Atiyeh [doc. # 25] ("1st Day Decl.") ¶ 38. See also Hr'g Tr. at 59.

III.    PROCEDURAL POSTURE

In November 2022, after the Trusts stopped servicing their mortgages, M&T assigned them to HUD. See 1st Day Decl. ¶¶ 38–39; Dx-1; Dx-2. HUD later auctioned the mortgages to another entity, which in turn assigned them to Lehigh. 1st Day Decl. ¶ 41; Dx-1; Dx-2. Then, on June 20, 2024, Lehigh filed foreclosure actions against the Trusts in the United States District Court for the Eastern District of Pennsylvania ("the District Court"). 1st Day Decl. ¶ 43; Dx-1; Dx-2. See also Lehigh Valley 1, LLC v. Whitehall Fiduciary, LLC, No. 5:24-cv-02627-CH (E.D. Pa. June 14, 2024). On May 2, 2025, the District Court entered an order appointing a receiver, to whom the Trusts were directed to turnover the Manor parcels and related property and information, including a current list of the Manor residents. Id. [doc. #65]. Finally, on December 19, 2025, the District Court entered an Order directing that, on or before December 29, 2025: (1) the Trusts must pay sanctions to the receiver; (2) the Trusts and/or Manors must supply the receiver with any rents they received beginning on October 31, 2025; and (3) the Debtors' 2023 lease amendments are void. Id. [doc. #164]. Debtors then filed their bankruptcy cases in this Court on December 26, 2025.

Lehigh now moves to dismiss the Trusts under 11 U.S.C. §§101, 105, and 109. Essentially, Lehigh's position is that the Trusts lack standing to be Chapter 11 debtors because they are not "business trusts" under the Bankruptcy Code.[2] Lehigh posits that the Trusts are better understood

---

[2]    This matter arguably arises under 11 U.S.C. §1112(b)(1), which provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter . . . for cause[.]" The inexhaustive "causes" enumerated under §1112(b)(4) include "the ineligibility of the entity for debtor status." OneUnited Bank v. Charles St. Afr. Methodist Episcopal Church of Bos., 501 B.R. 1, 7 (D. Mass. 2013). But the Motion does not invoke

as ordinary real estate trusts focused more on preserving the Manor parcels than conducting meaningful, independent business operations.  The Debtors disagree.  They argue that a trust need only engage in a moderate amount of commercial activity in order to be eligible for bankruptcy protection.  And the Debtors contend that the Trusts engage in commercial activities.

IV.    LEGAL STANDARD

A.  The Relevant Statutory Framework

In pertinent part, §109(d) provides that only "a person that may be a debtor under chapter 7 of this title . . . may be a debtor under chapter 11 of this title."  See 11 U.S.C. §109(d).  Aside from railroads and other institutions that are irrelevant here, §109(b) limits Chapter 7 eligibility to "person[s]."  See id. §109(b).  The Code defines "person" to include an "individual, partnership, and corporation[.]"  Id. §101(41). Critically, the term "corporation" is defined to include a "business trust."  Id. §101(9)(A)(v).  No other form of trust is eligible for bankruptcy relief.  In re EHT US1, Inc., 630 B.R. 410, 423 (Bankr. D. Del. 2021) ("[T]he only trust within the definition of a 'person' is a 'business trust.'" (quoting In re Dille Fam. Tr., 598 B.R. 179, 190 (Bankr. W.D. Pa. 2019))); Cath. Sch. Emps. Pension Tr., 599 B.R. 634, 652 (B.A.P. 1st Cir. 2019) ("[F]or a trust to be eligible to file a bankruptcy petition, it must qualify as a business trust." (internal quotation omitted)).  But the Code does not define the term "business trust."

B.  Whether State or Federal Law Should Govern

There is a split in authority regarding whether principles of state or federal law ought to govern construction of the term "business trust" under the Code.  One court in this Circuit recently

---

§1112(b)(1) as a basis for the relief sought therein, nor do the parties brief it as such.  Thus, the Court construes the Motion, consistent with its presentation, as a matter of interpretation under 11 U.S.C. §§101, 105, and 109.

took the view that state law, or "the law of the jurisdiction in which the trust is organized . . . shall govern." EHT, 630 B.R. at 425 (Sontchi, C.J.) (applying Singapore law in dispensing with a business trust eligibility challenge arising under 11 U.S.C. §§101, 109, and 1112(b)). See also In re Carriage House, Inc., 146 B.R. 352, 355–56 (D. Vt. 1992) (electing to apply state law); In re Village Green Realty Tr., 113 B.R. 105, 113 (Bankr. D. Mass. 1990) (same); In re Heritage N. Dunlap Tr., 120 B.R. 252, 254 (Bankr. D. Mass. 1990) ("Since the Code does not define what constitutes a business trust, we look to state law."). This approach ("the State Approach") runs contrary to the weight of authority, which "falls in favor of applying federal common law." EHT, 630 B.R. at 423 (citing Cath. Sch. Emps., 599 B.R. at 654)). Most courts do avoid myopic focus on state law when construing the term "business trust" under the Code. See e.g., In re Tiel Tr. I FBO Paula T. Douglass, 656 B.R. 810 (Bankr. D. Colo. 2024); Cath. Sch. Emps., 599 B.R. 634; Dille Fam. Tr., 598 B.R. 179; In re Blanche Zwerdling Revocable Living Tr., 531 B.R. 537 (Bankr. D.N.J. 2015); In re Kenneth Allen Knight Tr., 303 F.3d 671 (6th Cir. 2002); In re Secured Equip. Tr. of E. Air Lines, Inc., 38 F.3d 86 (2d Cir. 1994); In re Mosby, 61 B.R. 636 (E.D. Mo. 1985), aff'd, 791 F.2d 628 (8th Cir. 1986).[3]

Despite this consensus, divergent business trust standards are legion. EHT, 630 B.R. at 425 ("[T]he precept that applying federal common law to determine whether a trust is a business trust will promote uniformity has proved to be false."); Cath. Sch. Emps., 599 B.R. at 654 ("Although there is consensus that federal law should govern the determination of eligibility for trusts, a standard definition of the term 'business trust' remains elusive."); Knight Tr., 303 F.3d at

---

[3] It does not follow that all these courts applied "federal common law." United States v. Gen. Battery Corp., 423 F.3d 294, 304 (3d Cir. 2005) ("[T]he 'creation' of federal common law must be distinguished from statutory interpretation." (citing Atherton v. FDIC, 519 U.S. 213, 218 (1997))). Accord Tiel Tr., 656 B.R. at 825 ("Determining the meaning of a term in the Bankruptcy Code (such as 'business trust') is an exercise in which bankruptcy judges engage every day. The task is called statutory interpretation. It is not the creation of federal common law.").

9

679 ("[T]here are a number of court-made definitions, and indeed perhaps the only thing that all the cases have in common is the recognition that they all differ."); Secured Equip. Tr., 38 F.3d at 89 ("Other than two general points, a uniform body of law has not resulted and the decisions are, in fact, hopelessly divided." (quoting Cutler v. The 65 Sec. Plan, 831 F.Supp. 1008, 1014 (E.D.N.Y.1993) (citation modified)); In re Medallion Realty Tr., 103 B.R. 8, 10 (Bankr. D. Mass. 1989) ("The decisions are sharply . . . divided on the meaning of 'business trust.'").

A purported virtue of the State Approach is that business trust determinations thereunder "will be identical in all bankruptcy courts because the decision will uniformly be based on the law of the jurisdiction under which the trust exists." EHT, 630 B.R. at 425.[4]  Since trusts are not created under federal law and their "internal governance and legal rights and obligations are governed by state law," adherents to the State Approach have leaned heavily on the logic of Butner, which turned largely on the proposition that "[p]roperty interests are created and defined by state law." Id. at 424 (quoting Butner v. United States, 440 U.S. 48, 55 (1979)); Carriage House, 146 B.R. at 355–56 ("We know from Butner . . . to look to state law to ascertain property rights (or, in other words, to determine what sort of 'entity,' if any, would be created under state law based on the facts).").  In Butner, state law was used to determine "whether a security interest in property extends to [post-petition] rents and profits derived from the property[.]" Butner, 440 U.S. at 53.

At the Hearing, the parties stipulated that federal law should decide the outcome here.  The Court agrees.  Butner is ill-suited in this domain.  Ambiguous terms appearing in United States Code provisions are not property interests and should not be construed exclusively by reference to

---

[4]     Unsurprisingly, this view is not shared by those who favor the Federal Approach.  E.g., In re Arehart, 52 B.R. 308, 310–11 (Bankr. M.D. Fla. 1985) (assailing the State Approach because it "would result in different results in different states[,]" contrary to "what Congress intended when it enacted the bankruptcy laws in this country in conformity with the mandate of Article I, § 8, Cl. 4 of the Constitution, which provides that 'Congress shall have the power . . . to establish . . . uniform laws on the subject of bankruptcies.'").  Accord Cath. Sch. Emps., 599 B.R. at 654.

state law.  E.g., Tiel Tr., 656 B.R. at 824 ("Although the Butner decision is very important in the

context of substantive property rights, it has nothing to do with deciding the meaning of a specific

phrase (such as 'business trust') enacted by Congress in the Bankruptcy Code."); Knight Tr., 303

F.3d at 678 ("The connection between Butner and the 'business trust' question is by no means plain

. . . particularly because Butner dealt with substantive property rights, whereas here the question

is instead one of procedure, regarding whether the Trust has standing to file a bankruptcy case.").

Nevertheless, as indicated above, many business trust constructions have emerged from the cases.

Not all are directly on point.  And none bind the Court.  Having consulted numerous formulations,

the Court will employ a variation of its own, guided by the logic of those surveyed below.

C.  Surveying Prominent Constructions of the Term "Business Trust"

1.  The "Lewellyn" Test

Neither the Supreme Court nor the Third Circuit has squarely addressed what constitutes a

"business trust" under the Code.  However, both courts have addressed the traditional versus

business trust dichotomy in other contexts.  Indeed, it appears that the Third Circuit was the first

to coin the term "business trust."  It did so in affirming a judgment that a company describing itself

as a trust owed federal taxes.  Among two (2) broad classes of trust, the court first sketched "[o]ne,

where the trustees merely collect dividends or interest, or rentals, and distribute them among the

shareholders[.]"  Little Four Oil & Gas Co. v. Lewellyn, 35 F.2d 149, 150 (3d Cir. 1929).  This

class is akin "to a trust under a will where the trustee merely collects income and distributes it

among beneficiaries."  Id.  Another class "is organized or declared for business purposes and the

trustees carry on an active business for profit, regarded as a plain unincorporated joint-stock

association and liable for taxes at the corporation rate."  Id.  Thus, "[t]he real test is whether the

shareholders or trustees, or both combined, carry on business for profit, and, if they do, they

11

constitute a business trust . . . with liability for taxes." Id. (citing Hecht v. Malley, 265 U.S. 144 (1924)).  Ultimately then, the business trust question "is to be determined not by the broad powers of the trustees . . . but by what the trust was actually doing through its trustees." Id. at 151.

### 2.   The "Morrissey" Test

Before Lewellyn, business trusts were referred to as "Massachusetts trusts," which the Supreme Court summarized as: "an arrangement whereby property is conveyed to trustees . . . to be held and managed for the benefit of . . . the holders of transferable certificates[.]" Hecht, 265 U.S. at 146.  Then came the Supreme Court's decision in Morrissey (a tax case), which some have characterized as encapsulating the original meaning of the term "business trust" when the Code was enacted.  Tiel Tr., 656 B.R. at 830 (citing contemporaneous authorities).  See also Morrissey v. Comm'r of Internal Revenue, 296 U.S. 344, 359 (1935).  The holding in Morrissey is commonly paraphrased to define business trusts as those: (1) created *and* maintained for a business purpose; (2) whose property is held by trustees; (3) with centralized management; (4) which continue uninterrupted by deaths of beneficial owners; (5) whose interests are transferable; and (6) with limited liability.  E.g., In re Two Rivers Irrevocable Tr., 653 B.R. 284, 289 (Bankr. M.D. Ga. 2023); In re Sung Soo Rim Irrevocable Intervivos Tr., 177 B.R. 673, 677 (Bankr. C.D. Cal. 1995).  This test governs business trust eligibility under §109 in the Eighth Circuit.  In re Mosby, 61 B.R. 636, 638 (E.D. Mo. 1985), aff'd, 791 F.2d 628 (8th Cir. 1986); Vera T. Welte Testamentary Tr., 2024 WL 2819677, at *2–3 (Bankr. N.D. Iowa June 3, 2024).[5]

---

[5]   Some courts believe Congress foreclosed application of Morrissey's fifth prong by adopting the "simple phrase 'business trust'" in lieu of language found in the forerunning Bankruptcy Act, whereunder trusts were ineligible for bankruptcy relief unless their "beneficial interest or ownership [was] evidenced by certificate or other written instrument." E.g., Medallion Realty Tr., 103 B.R. at 11 ("That [Congress] chose to make such a change is sufficient indication of a purpose to broaden the types of trusts which can qualify." (citing In re Treasure Island Land Tr., 2 B.R. 332 (Bankr. M.D. Fla. 1980)); Knight Tr., 303 F.3d at 679 ("[T]he Morrissey criteria were meant for the Internal Revenue Code, and they contradict the 1978 liberalization of the Bankruptcy Code's treatment of business trusts[.]").

3.   The "GBForefront" Test

More recently, the Third Circuit reached the business trust issue in the context of diversity jurisdiction citizenship, where "[t]he primary point of distinction is . . . that a traditional trust exists as a fiduciary relationship and not as a distinct legal entity."  GBForefront, L.P. v Forefront Mgmt. Grp., LLC, 888 F.3d 29, 40 (3d Cir. 2018).  So, courts should first consider "the law of the state where the trust was formed to determine whether the trust has the status of a juridical person."  Id. (citing Raymond Loubier Irrevocable Tr. v. Loubier, 858 F.3d 719, 730–31 (2d Cir. 2017); Wang ex rel. Wong v. New Mighty U.S. Tr., 843 F.3d 487, 494–95 (D.C. Cir. 2016)).  But the inquiry does not end there because federal diversity "jurisdiction is based on constitutional and federal statutory authority, not state law."  Id.  Accord N. Hills Vill. LLC v. LNR Partners, LLC, 479 F. Supp. 3d 189 (W.D. Pa. 2020) (holding that a trust was a business trust for diversity jurisdiction purposes though it failed to properly register as a business trust under Pennsylvania law).

The second stage of analysis under GBForefront centers on the purpose of the trust. GBForefront, 888 F.3d at 40 ("a traditional trust facilitates a donative transfer . . . while a business trust implements a bargained-for exchange.").  To guide in this regard, the court referenced a law review article and the Second Restatement of Trusts.  Id. at 40–41.  This led the North Hills Village court to identify roughly thirteen inexhaustive business trust indicia, including: the settlor's receipt of compensation for conveying assets into the trust; the free transferability of trust assets; continuity of the enterprise after the death of its beneficial owners; formation by investors; centralized management; controllable trustees; amendable trust terms; and state registration requirements.  See N. Hills Vill., 479 F. Supp. 3d at 197–98.  (citing Dille Fam. Tr., 598 B.R. at 199–200; S.I. Strong, Congress and Commercial Trusts: Dealing with Diversity Jurisdiction Post-Americold, 69 Fla. L. Rev. 1021, 1037–40 (2017)).  Accord RBx Cap., LP v. Xorax Fam. Tr., 2023

13

WL 3324682, at *3 (E.D. Pa. May 8, 2023) (same).  Despite all these factors, many of which mirror Morrisey's, "[t]he ultimate question remains whether, based on the undisputed record evidence, the . . . purpose was to facilitate a donative transfer."  Id.

### 4.  The "Secured Equipment Trust" Test

Only two (2) Courts of Appeals have squarely addressed "business trust" eligibility under the Code.  The Second Circuit was the first to do so.  It reached this issue in the case of a trust formed to facilitate secured financing for its namesake airline.  Secured Equip. Tr., 38 F.3d at 87–88.  The resulting standard is elusive.  Indeed, the courts which have conducted the most exhaustive surveys in this area disagree on the fundamental contours of Secured Equipment Trust.  Compare Cath. Sch. Emps., 599 B.R. at 658 (divining a five-part test) with Tiel Tr., 656 B.R. at 841 ("[T]he [Secured Equipment Trust] case simply never articulated a 'multi-factor' test.").  See also Sung Soo Rim, 177 B.R. at 675 (opining that Secured Equipment Trust "yields no rule of decision that provides any guidance for other courts.")

The Secured Equipment Trust panel embraced a prevalent tautology: "business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res."  Id. at 89 See also Treasure Island, 2 B.R. at 334 ("[B]usiness trusts are created for the purpose of carrying on some kind of business or commercial activity *for profit*" (emphasis added)); Welte Testamentary Tr., 2024 WL 2819677, at *3 (same)).  A variation of this statement supports the Sixth Circuit's "primary purpose" test.  See Knight Tr., 303 F.3d at 680 ("[T]rusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts[.]").  Similarly, in Medallion Realty Trust, the test collapsed down to: "whether the trust was created to transact

business for the benefit of investors." Medallion Realty Tr., 103 B.R. at 11 ("This . . . test is certain to deny bankruptcy relief to the traditional donative trust created for the benefit of family members, a result which is consistent with both the history of estate ineligibility and what appears to be the core reasoning of most of the decisions.").

A related Secured Equipment Trust maxim is just as well traveled. That is, engagement "in business-like activities . . . without more, does not necessarily demonstrate that a trust is a business trust." Secured Equip. Tr., 38 F.3d at 89. Accord Dille Fam. Tr., 598 B.R. at 195 ("Many ordinary trusts empower the trustee to engage in business activities and remit income from trust assets to beneficiaries, and such facts do not *per se* transform a trust into a 'business trust.'"); In re Blanche Zwerdling Revocable Living Tr., 531 B.R. 537, 545 (Bankr. D.N.J. 2015) ("[J]ust because a trust engages in business like activities, without more, it does not necessarily follow that the trust is a business trust."); Mosby, 61 B.R. at 638 ("It is well established that a business trust is something more than simply a trust that carries on a business." (citing Hecht, 265 U.S. at 144)). Accord Welte Testamentary Tr., 2024 WL 2819677, at *2 (same).

Accordingly, whatever its precise contours, the Secured Equipment Trust standard, like so many others, boils down to a totality-of-the-circumstances inquiry. Secured Equip. Tr., 38 F.3d at 90–91 ("our 'inquiry must focus on the trust documents and the totality of the circumstances, not solely on whether the trust engages in a business[.]'" (quoting In re St. Augustine Tr., 109 B.R. 494, 496 (Bankr. M.D. Fla. 1990))). See also Cath. Sch. Emps., 599 B.R. at 662 ("Regardless of [which test] is applied . . . "[t]he one overriding principle that emerges from the cases is that the determination of whether a trust is a business trust is fact-specific and focuses on the purpose and operations of the trust." (second alteration in original)); Knight Tr., 303 F.3d at 680 ("The [business trust] determination is fact-specific, and it is imperative that bankruptcy courts make thorough and

specific findings of fact to support their conclusions—findings, that is, regarding what was the intention of the parties, and how the trust operated." (citation modified)); Dille Fam. Tr., 598 B.R. at 194 ("[T]he Court looks to the trust instrument and surrounding circumstances for guidance."); Blanche Zwerdling, 531 B.R. at 545 ("It is evident from the case law that whether a trust is a business trust is a fact-sensitive determination that goes beyond just the trust documents.").

### 5.   The "Eagle Trust" Test

Turning now to in-Circuit, trial court formulations, the Eagle Trust test warrants mention.[6] In Eagle Trust, the district court affirmed dismissal of a putative trust debtor on ineligibility and bad faith grounds.  The court employed the following standard, which defines a business trust as one: (1) formed for the primary purpose of transacting business or commercial activity, as opposed to preserving assets; (2) formed by a group of investors who contribute capital to the enterprise with the expectation of receiving a return on their investment; (3) formed in compliance with state law; and (4) that allows for the free transfer of its beneficial interests.  Eagle Tr., 1998 WL 635845,

---

[6]   Lehigh suggests that this Court is bound by the Eagle Trust test because it was later applied in Joobeen, the reported Opinion of a district judge sitting in this District.  There are two problems with this suggestion.  First, Joobeen is inapposite.  In Joobeen, the Chapter 13 cases of a father and son were dismissed with prejudice on bad faith grounds, and prospective stay relief was granted as to real property held in trust on the son's behalf.  In re Joobeen, 385 B.R. 599, 604–05 (E.D. Pa. 2008).  On appeal, the Chapter 13 trustee argued, inter alia, that "because [the father] filed as a trustee of [the son's] trust, and the trust at issue is not a business trust, [the son's] case must fail."  Id. at 608.  The trust's sole source of income was rent paid by tenants of the property, all of which was controlled by the father, who doubled as the trust's settlor and trustee.  Id.  So, the standing trustee posited that because the father was, in essence, the only filer, it was appropriate to attribute his bad faith to the son.  See id.  Accordingly, although the trust, through its trustee, arguably filed a Chapter 13 petition on behalf of its beneficiary, the trust's eligibility for bankruptcy relief was not directly at issue.  Thus, the court's glancing application of the Eagle Trust factors is dictum.

Second, "there is no such thing as 'the law of the district.'"  Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991).  It follows that this Court is not bound by Eagle Trust.  In re D'Angelo, 475 B.R. 424, 439 n.12 (Bankr. E.D. Pa. 2012) ("[W]ithin the Third Circuit district court decisions, while entitled to deference, are not binding on its bankruptcy courts." (citing Threadgill, 928 F.2d at 1371)), aff'd, 491 B.R. 395 (E.D. Pa. 2013).  Accord In re Gonzalez, 550 B.R. 711, 719 (Bankr. E.D. Pa. 2016) (Frank, J.) (same).  See also 28 U.S.C. §151 (providing that "bankruptcy judges in regular active service shall constitute a unit of the district court[.]").  Accord In re Romano, 350 B.R. 276, 281 (Bankr. E.D. La. 2005) (reasoning from 28 USC §151 that bankruptcy courts are no more bound than district courts by one of the latter's decisions because, in a multi-judge district, "a rule imposing stare decisis effect of a district court decision effectively makes final the first district court to rule on an issue, even though other judges in the district may disagree with the decision.").

at *5. These are familiar requirements. Prongs one and two echo various purposive slants on Morrisey's first factor. Prong three is consonant with the first step of the GBForefront test, which is generally in line with the approach taken by courts construing §101(9) of the Code. E.g., Sung Soo Rim, 177 B.R. at 676 (looking, among other factors, first at "whether state law recognizes a separate type of entity called a 'business trust[,]'" and then at "whether the trust in question formally qualifies as a 'business trust' under the relevant state law requirements."); Dille Fam. Tr., 598 B.R. at 192 ("As numerous courts have observed, a trust's failure to qualify as a 'business trust' under state law may be evidence of the settlor's intent that the trust not operate as a business trust."); Tiel Tr., 656 B.R. at 846 ("[T]he Grantor's choice of law goes a long way toward showing intent."). And prong four mirrors the fifth Morrissey factor.

### 6. The "Dille Family Trust" and "Blanche Zwerdling" Tests

Finally, it is worth mentioning that two (2) bankruptcy courts in this Circuit have recently applied standards which ring of others surveyed above. For example, in Dille Family Trust, the court settled on a two-part test requiring the candidate trust to prove that it: (1) "was created for the purpose of transacting business for a profit (as opposed to merely preserving a res for beneficiaries)"; and (2) "has all of the indicia of a corporate entity." Dille Fam. Tr., 598 B.R. at 194 ("If any one of these two characteristics is not present, then the trust is not a 'business trust' and is ineligible for bankruptcy relief[.]"). The first prong is just another gloss on the purposive standards articulated in Secured Equipment Trust and Knight Trust, which are little more than slants on the first Morrissey factor. Moreover, application of the second prong rested on two of the other five Morrisey factors, including the fact that interests in the trust were not freely transferable. See id. at 200–01. See also Tiel Tr., 656 B.R. at 841 ("[T]he new Dille Family Trust two-part test is mostly just the Morrissey factors in disguise."). The Blanche Zwerdling test is

17

even less rigid.  But there again, "[t]he focus is on both the purpose of the trust and the actual operations of the trust."  Blanche Zwerdling, 531 B.R. at 545.

### D.  The Court's Formulation

Despite tension in the foregoing authorities, certain throughlines are discernable.  Among the most important attributes of a business trust are: (1) existence as such under applicable state law; (2) transferable, beneficial interests; (3) perpetual existence; (4) formation by investors; and (5) creation *and* maintenance for the purpose of conducting business.  Although these criteria are not exhaustive, failure to satisfy the last factor is dispositive.  After all, this factor essentially restates the issue presented here—which is, of course: whether, within the meaning of the Code, the candidate trust is a business trust.  Ultimately, this determination necessarily hinges on the facts and circumstances of a given case.  And it should be rendered with a healthy dose of common sense, bearing in mind that the burden of persuasion rests firmly with those filing for bankruptcy.  Dille Fam. Tr., 598 B.R. at 189 ("[T]he burden of proof in establishing eligibility for bankruptcy relief lies with the party filing the bankruptcy petition.").

### V.   CONCLUSIONS OF LAW

#### A.  The Trusts Are Not Business Trusts Under Pennsylvania Law

The main thrust of the Debtors' state law argument is that the Trusts constitute business trusts under Pennsylvania law because the Tax Board "previously declared that [Whitehall] is a business trust[.]"  [Doc. #190] ¶ 12.  See also id. ¶ 59 ("The Board *expressly* determined that [Whitehall] is a Business Trust under Pennsylvania law." (emphasis added)).  Uncompensated transfers to living or ordinary trusts are excludable from taxation under the Realty Transfer Tax Act ("the RTTA").  See 72 Pa. C.S. §8102-C.3(8)–(8.1).  Pursuant to the RTTA, a "living trust"

18

must be "intended as a will substitute[.]" Id. §8101-C. When the Tax Board entered its order, Whitehall was still subject to HUD Provisions proscribing certain amendments of its trust instrument. Because "a will can be amended at any time[,]" the Tax Board concluded that Whitehall was not a living trust. The Tax Board went on to conclude, without explication, that Whitehall was not an ordinary trust under the RTTA because "it was structured to operate a business by the Trustee." The Debtors submit that the Tax Board would reach the same conclusions regarding Saucon because it is "virtually identical" to Whitehall.

The Debtors also surface Pennsylvania cases, apparently for the proposition that when the Tax Board proclaims a trust is neither "living" nor "ordinary," the trust is thereby declared a business trust under the RTTA, and thus under the Code by extension. See [doc. #190] ¶ 59 (citing see Kosco v. Commw., 987 A.2d 181 (Pa. Commw. Ct. 2009); Gudzan v. Commw., 962 A.2d 718 (Pa. Commw. Ct. 2008)). The Kosco and Gudzan courts confronted the same basic issue as the Tax Board: whether the trusts before them constituted ordinary and/or living trusts under the RTTA. Kosco, 987 A.2d at 187; Gudzan, 962 A.2d at 720. Under the RTTA, an ordinary trust does not: (1) intend "to carry on business and divide gains"; (2) treat its "beneficiaries as associates or partners"; (3) treat "interests in the trust as personal property"; (4) permit "the free transferability of beneficial interests"; (5) have "centralized management"; or (6) provide for "continuity of life." 72 Pa. C.S. §8101-C; Kosco, 987 A.2d at 187–89. The Kosco court opined that these are "feature[s] of a business trust." Id. It then affirmed a Tax Board ruling that an intra-family transfer of a retirement home was taxable because the subject Kosco Family Land Trust instrument evidenced all these business features. Id. at 189. This decision turned entirely on the language of the trust instrument. There was no indication of actual business operations.

19

Anyway, while the RTTA "does not specifically define the term 'business trust,'" id. at 183–84 n.4., it does define the term "corporation" to include a "business trust . . . which is organized under the laws of this Commonwealth[.]" 72 Pa. C.S. §8101-C.  Lehigh asserts in its opening brief that the Trusts lack bankruptcy standing in part because they are not registered "business trusts" as required by Pennsylvania statute.  Accordingly, Lehigh points to the General Association Act ("the GAA"), which specifically defines a "business trust" as one:

> (i) Whose deed of trust or other organic document has been filed in the department and is in effect under this chapter.
>
> (ii) Whose deed of trust or other organic document states, by amendment or otherwise, that the trust exists subject to the provisions of this chapter, in the case of a business trust heretofore established under the laws of this Commonwealth or heretofore or hereafter established under the laws of any other jurisdiction.

15 Pa. C.S. §9501(a)(1).  Thus, pursuant to the GAA, "a trust is a business trust if the deed of trust is either: (1) filed with the Department of State; or (2) states that the trust exists subject to the provisions of Title 15, Chapter 95 'Business Trusts.'" N. Hills Vill., 479 F. Supp. 3d at 195.  Lehigh insists that the Trusts fail both requirements because neither of the trust instruments were: (1) filed with the Pennsylvania Department of State; or (2) reference their existence subject to the GAA.  Debtors concede the first point.  Hr'g Tr. at 86 ("[The Trusts] are not registered with the State, we agree with that.").  Having thoroughly reviewed the trust instruments, the Court finds no mention therein of the GAA.

To summarize, the Debtors' state law argument rests on juridical constructions of the RTTA.  Lehigh's argument is grounded in the plain text of the GAA, which was "enacted to codify and clarify certain common law principles applicable to business trusts[.]" 15 Pa. C.S. §9501(c).  Moreover, it is hard to ignore the fact that the Saucon property was deeded to a self-proclaimed

20

"LIVING TRUST."  For years Atiyeh insisted that the Whitehall property was, too.  Now that it suits him, he argues precisely the opposite.  Regardless, between the RTTA and GAA, only the latter explicitly defines the term "business trust."  Because the Trusts do not meet this definition, Lehigh has the better argument.  See e.g., Eagle Tr., 1998 WL 635845, at *5 (concluding that a putative debtor was not a Pennsylvania business trust because it failed to register as such with the Department of State (citing 12 Pa. C.S. §9503(a)); N. Hills Vill., 479 F. Supp. 3d at 195 (determining that a real estate trust was not a Pennsylvania business trust because it failed to comply with the dictates of 15 Pa. C.S. §9501(a)); In re Heritage N. Dunlap Tr., 120 B.R. 252, 254 (Bankr. D. Mass. 1990) ("Where the states tell you what you must do to be a business trust, that is what you must do! (citing L & V Realty Trust, 61 B.R. 423 (Bankr. D. Mass. 1986))).

B.  Beneficial Interests in the Trusts Are Not Transferable

Whitehall and Saucon are classic spendthrift trusts.  Their respective trust instruments feature identical "Spendthrift Clause[s]," which provide that:

> The interest of any beneficiary in or to principal and income of the Trust Estate shall not be subject to assignment, alienation, pledge, attachment, or claims of creditors of such beneficiary or anyone claiming by, through or under such beneficiary and may not otherwise be voluntarily or involuntarily alienated or encumbered by such beneficiary, except as otherwise expressly provided herein.

Dx-4 ¶ 7; Dx-13 ¶ 9.  Plainly, these clauses disallow transfer of present interests—and future remainder interests—in principal and income of the Trusts' estates.  So, the Trusts would likely be recognized as valid, enforceable spendthrift trusts under Pennsylvania law.  Wachovia Bank, N.A. v. Levin, 419 B.R. 297, 300–01 (E.D.N.C. 2009) ("Pennsylvania recognizes a trust as a spendthrift trust when it includes language sufficient to 'restrain both voluntary and involuntary transfer of a beneficiary's interest." (citing 20 Pa. C.S. §7742(a)-(b)), aff'd sub nom. Levin v. Wachovia Bank,

21

436 F. App'x 175 (4th Cir. 2011).  See also Levin, 419 B.R. at 301 ("Pennsylvania Courts 'construe spendthrift provisions broadly.'" (quoting Spencer v. Blanchard, 201 B.R. 108, 125 (Bankr. E.D. Pa. 1996))).  Administration of the Trusts' bankruptcies could be complicated by the fact that "the assets of valid spendthrift trusts are expressly excluded from the definition of 'property of the estate.'"  Sung Soo Rim, 177 B.R. at 678–79 (citing 11 U.S.C. §541(c)(2)).

This fact weighs strongly in favor of dismissing the Trusts.  Tiel Tr., 656 B.R. at 846 ("[A] spendthrift clause in the Trust Agreement is very powerful evidence that the Trust does not have a business purpose."); Two Rivers, 653 B.R. at 290 ("[A] trust which includes an enforceable spendthrift clause is 'powerful evidence that the trust does not have a business purpose.'" (quoting In re Quadruple D Tr., 639 B.R. 204, 237 (Bankr. D. Colo. 2022))); Sung Soo Rim, 177 B.R. at 678 ("Transferability of the trust's beneficial interest also appears to be critical in distinguishing between a 'business trust' and a traditional trust. '[E]very case that has involved a restriction on the transferability of the beneficiaries' interest . . . has held the trust did not qualify as a debtor.'" (quoting In re Woodsville Realty Trust, 120 B.R. 2, 6 (Bankr. D.N.H. 1990))); Mosby, 61 B.R. at 638 (affirming dismissal of a spendthrift trust).

C.  The Trusts Are Not Meant to Exist in Perpetuity

A business trust is "secure from termination or interruption by the death of owners of beneficial interests." Morrissey, 296 U.S. at 359.  Here, the Trusts are not secure from termination. Whitehall's trust instrument specifically contemplates a term of fifty years. Saucon's trust instrument contains no such provision.  But both instruments provide for estate succession and intra-family distribution of the res.  If Atiyeh predeceases his wife, she succeeds him as primary beneficiary.  Upon the death of Atiyeh and his wife, Trust corpuses must be distributed to their children and/or lineal descendants.  Said distribution may occur in stages, depending on the age

22

and educational attainment of the children when the succession provisions take effect. Nevertheless, once both parents have passed away, the Trusts were not designed to survive the youngest child's fiftieth birthday. Dx-4 ¶ 2.2.4.2.2.3; Dx-13 ¶ 3.2.4.2.2.3. In fact, the Trusts can be liquidated much sooner. Once Atiyeh's children turn twenty-one, if their parents have already predeceased them, the trustee can accelerate distribution of the trust corpuses, to the point of their total exhaustion—the only caveat being that this distribution must promote the children's interests and intent of the trusts. Dx-4 ¶ 2.2.4.2.3; Dx-14 ¶ 3.2.4.2.3. Saucon's remainder interests became distributable on June 30, 2025. Dx-4 ¶ 2.2.4.1.

The intention was—and remains—that the Trusts would eventually be dissolved and their interests distributed among Atiyeh's descendants. Therefore, it is safe to conclude that the Trusts are family trusts. See Tiel Tr., 656 B.R. at 848 ("The termination upon death provision establishes that the Trust is merely a typical family donative trust."); Two Rivers, 653 B.R. at 290 ("[T]he beneficiaries of the Two Rivers Trust are relatives of [the settlor], which indicates Two Rivers Trust is a family trust rather than a business trust."). This is yet another strong indicator that the Trusts are ineligible for bankruptcy relief. Sung Soo Rim, 177 B.R. at 678 ("Bankruptcy courts have also consistently denied family and estate planning trusts the standing to pursue bankruptcies. Unlike business trusts, these trusts are almost always governed by state probate and estate laws, which offer an alternative forum for resolution of problems arising under the trust." (citing cases)).

### D. The Trusts Were Not Formed by a Group of Investors

The Trusts were not formed by a group of investors seeking returns on their investment. Atiyeh was the sole settlor and conveyor of assets into the Trusts. Yet he did not thereby invest in the Trusts or the assets conveyed into them. No meaningful placement or layout of capital occurred by virtue of the Trusts' formation. Then as now, Atiyeh owned both sides of the settlement sheets.

23

He effectively owned and controlled the Trusts—same as he owned, operated, and controlled the properties conveyed into them.  Atiyeh also owned and operated the company charged with construction and maintenance of the properties.  The Debtors are keen for this Court to follow GBForefront and its progeny.  But the complete concentration of ownership interests in Atiyeh forecloses the possibility of a bargained-for exchange.  See N. Hills Vill., 479 F. Supp. 3d at 196 ("[T]he Court must . . . determine whether [the candidate trust] either implements a bargained-for exchange, as in a business trust, or a donative transfer, as in a traditional trust.").

Furthermore, Atiyeh's placement of the Manor properties in trust was hardly the root cause of any income or profit generated on his behalf.  The Manors are the real profit centers.  If Atiyeh took excess revenue out of the Trusts it was only because he chose to charge—and/or because HUD required him to charge—the Manors more rent than the Trusts paid their mortgagees.  HUD and lease agreements notwithstanding, Atiyeh could simply extract all net income from the Manors directly, just as he presumably has done for the past five (5) years.

E.   The Trusts Were Not Created *and* Maintained to Conduct Business

It is notable that the Manors are chiefly responsible for generating Atiyeh's profits because a putative debtor trust's standalone profit value is "relevant to [a] determination of whether the Trust is a business trust." Secured Equip. Tr., 38 F.3d at 90.  Indeed, in Secured Equipment Trust, this profit motive inquiry was central to the court's decision to affirm dismissal of the candidate trust.  There, in exchange for ownership certificates, investors paid the trust $500 million, which the trust used to purchase part of its namesake airline's fleet.  Id. at 87.  The fleet was then leased back to the airline in exchange for rental payments equaling the principal and interest due on the certificates.  Id.  When the airline defaulted, the collateral trustee repossessed and actively managed the fleet.  Id. at 88.  The trust was deemed ineligible because it was not established to

24

generate the investors' interests in repayment, but rather as an optimal means of securing them. Id. at 90 ("[T]he Trust was not established to run a business enterprise, but was merely created to serve as a vehicle to facilitate a secured financing[.]"). Thus, the trust's "business" of leasing collateral and retaining professionals to help sell it was irrelevant. Id. Much the same is true here. Atiyeh testified that he formed the Trusts at the behest of his secured lenders, who apparently sought to insulate real estate ownership from downstream operational liability. Meanwhile, Atiyeh tried to insulate himself from associated transfer tax liabilities. And Atiyeh also intended for the Trusts to serve as a means of bequeathing part of his residuary to his descendants.

The Debtors argue that the Trusts were formed to do more than that. They cast the Trusts as indispensable cogs in Atiyeh's operational scheme, without which his businesses would be less profitable. The Debtors hold the Trusts out as integral property managers driving physical expansion of the Manor condominiums and maintenance thereof—or at least as paymasters for the same. Yet this is not so. The record is bereft of any indication that the Trusts ever had officers or retained employees. To be sure, the Trust instruments allow the Trusts to play an active role in Manor construction, renovation, and upkeep. But in reality, PVC is the entity tasked with such operations. All indications are that the Trusts never bore the responsibility of paying PVC for its services. Instead, this load was likely shouldered by the Manors, bound as they are by triple-net clauses in their lease agreements.

Business trusts engage in more than the mere collection and distribution of rents. Lewellyn, 35 F.2d at 150. Yet it appears that the sum of the Trusts' "operational" output was their collection of rental income for distribution to Atiyeh and his secured lenders. Such passivity weighs in favor of dismissal. In re Cath. Sch. Emps. Pension Tr., 584 B.R. 82, 87 (Bankr. D.P.R. 2018) ("A trust that is passive because 'it is not engaged in active management of assets with a

25

goal of increasing its profitability or value'—irrespective of whether it is involved in commercial transactions—is not a business trust eligible to file bankruptcy." (quoting Robert J. D'Agostino, The Business Trust and Bankruptcy Remoteness, 2011 Ann. Surv. Of Bankr. Law 4, Volume 2011 (September 2011))), aff'd sub nom. Cath. Sch. Emps. Pension Tr., 599 B.R. 634 (B.A.P. 1st Cir. 2019). See also Tiel Tr., 656 B.R. at 847 ("[E]ngaging in some passive business activity, such as collecting rents from the seven operable railroad cars or collecting interest from two bank accounts does not make the Trust a business trust. Instead, the Trust is simply a family donative trust.").

Other in-Circuit cases buttress this notion. For example, in Eagle Trust, the candidate trust held most of the settlor's assets, including interests in income-generating tracts of real property; one such tract was leased to the settlor's businesses, which paid the trust rent. Eagle Tr., 1998 WL 635845 at *2. Parcels of another such tract were leased to an affiliated entity, but most of these rental payments were offset. Id. at *1–2. Shortly before the trust filed for bankruptcy, one of its settlor's creditors scheduled an execution sale for these tracts. Id. at *3–4. The district court agreed that the trust was not formed for the primary purpose of transacting business because it "simply holds real estate and personal property, receives some income from these properties, and pays the maintenance and expenses of holding the property for the benefit of [the settlor] and his family." Id. at *5.

Likewise, in Blanche Zwerdling, judgment creditors moved to dismiss the candidate trust on grounds of ineligibility and bad faith. Blanche Zwerdling, 531 B.R. at 538. Counsel for the trust conceded that it filed for Chapter 11 to stay enforcement of a probate order prescribing the sale of trust assets to satisfy creditors' judgments. Id. at 546. The trust was originally funded with the settlor's assets, including parcels serving as sites for a multi-unit, mixed-purpose property, as well as a condominium and a townhouse. Id. at 539. The trust's stated purpose was to retain these

26

assets for the settlor's benefit and to provide for their orderly distribution upon the settlor's death. Id. The trust's beneficiary was the settlor's granddaughter. Id. And the trust instrument granted the trustee discretion to carry on various business activities, including the conversion of trust assets into securities or other personal or real property. Id. at 539–40. During her lifetime, the settlor managed the multi-unit property; she also claimed all the trust's profits and losses on her personal tax returns. Id. at 540. Relevant to the trust's dismissal was the fact that, apart from a pre-petition sale of the condominium, composition of the trust corpus remained static. Id. Furthermore, despite trust instrument provisions for "continuing business operations"—which are typical of family trusts—the trust only engaged in the business of managing and leasing the aforesaid real estate. Id. at 545–46. Accordingly, the court dismissed the trust. Id. at 546.

Finally, in Dille Family Trust, the candidate trust claimed disputed intellectual property rights in the "Buck Rogers" entertainment franchise. Dille Fam. Tr., 598 B.R. at 182–83. Several factors informed the court's determination that the candidate trust was ineligible for bankruptcy relief. First, naming the trust "The Dille *Family* Trust" evidenced an estate-planning purpose further exemplified by provisions for intra-family succession and other forms of estate disposition. Id. at 194–96. Other guiding circumstances included the trust's failure to file an IRS Form 1120 and the non-bankruptcy trustee's assertion in collateral litigation that the trust lacked capacity to be sued. Id. at 197. And although the trustee was empowered to *manage* trust business, sell and *lease* trust property, and *borrow* or lend money, "such facts do not *per se* transform a trust into a 'business trust.'" Id. at 195. See also Welte Testamentary Tr., 2024 WL 2819677, at *2 (dismissing candidate trust though it invested in an LLC and leased farmland to its sole beneficiary); Two Rivers, 653 B.R. at 291 (dismissing candidate trust though it "supposedly leased land and recreational vehicles" to various related entities).

27

These cases are instructive. Nonetheless, assume *arguendo* that collecting rent pursuant to real estate leases constitutes *prima facie* evidence of a settlor's intent to form a business trust. Even if that was the rule—it is not—the presence of *ongoing* business operations, or lack thereof, is also highly relevant to an eligibility determination arising under §109. Id. at 289 ("A court should first inquire into the intention or purpose of the trust at the time of its creation, then if the court finds the trust was created for business purposes, the court should determine whether the trust engaged in business activities." (citing Quadruple D Tr., 639 B.R. at 236)). See also Cath. Sch. Emps., 599 B.R. at 652 ("[A] debtor's eligibility for bankruptcy relief under [§] 109 is determined by facts *as they exist at the time the bankruptcy petition is filed*[.]" (quoting In re Myers, 2007 WL 2428694, at *3 (Bankr. E.D. Pa. Aug. 22, 2007) (emphasis in original) (second and third alteration in original))).

Thus, the Court is persuaded that the instant Trusts lack a valid business purpose. Not only is rent collection their sole discernable business activity, but the Trusts have not engaged in it for more than five years! At least in the Eagle Trust and Blanche Zwerdling cases, rent collection was ongoing when the bankruptcies commenced. But here, the Trusts seem utterly ambivalent about collecting the millions of dollars in rent they are due under their valid lease agreements with the Manors. Currently, it appears that the Trusts' primary purpose is to shield the Manors from having to make good on their prior rental commitments. Indeed, this case commenced shortly after the District Court voided amendments to the lease agreements, whereby the Trusts forgave prior arrears and effectively ensured more of the same. If these Trusts are eligible for bankruptcy relief, then the "business" modifier contained in 11 U.S.C. §101(9)(A)(v) is purposeless. This cannot be. Accordingly, the Trusts must be dismissed.

## VI.    CONCLUSION

The Trusts are not "business trusts" within the meaning of the Bankruptcy Code.  They neglected to register as business trusts pursuant to the applicable Pennsylvania statute.  Beneficial interests in the Trusts are not transferable.  The Trusts are not meant to exist in perpetuity.  They were not formed by investors.  Moreover, the Trusts were not created and maintained for business purposes.  For these reasons, the Motion will be granted.  An appropriate order will follow.

Date: March 19, 2026

_____
Hon. Patricia M. Mayer, Judge
United States Bankruptcy Court